JACOBSON BROTHERS, INC., et al.

v.

The UNITED STATES.

No. 355–70.

United States Court of Claims.

March 19, 1975.

Robert C. Miller, Washington, D. C., attorney of record, for plaintiffs.

Louise O'Neil, Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before KASHIWA, KUNZIG and BENNETT, Judges.

OPINION

PER CURIAM:

This case comes before the court on defendant's motion, filed December 31, 1974, requesting that the court adopt the recommended decision of Trial Judge Hal D. Cooper, filed November 6, 1974, pursuant to Rule 134(h), as the basis for its judgment in this case since plaintiffs have failed to file a notice of intention to except thereto and the time for so filing pursuant to the Rules of the court has expired. Upon consideration thereof, without oral argument, since the court agrees with the recommended decision, as hereinafter set forth *, it hereby grants defendant's motion and affirms and adopts the said decision as the basis for its judgment in this case. It is therefore concluded that plaintiffs are not entitled to recover and the petition is dismissed.

OPINION OF TRIAL JUDGE

COOPER, Trial Judge:

Plaintiffs, under 28 U.S.C. § 1498, seek reasonable and entire compensation for the alleged unauthorized use and manufacture by or for the United States of an invention described in claims 1, 2, 4, 6, and 7 of United States Letters Patent No. 3,014,984, entitled "Underwater Television Device," issued on December 26, 1961, to Irenus C. Jacobson, now deceased.[1]

Plaintiff Jacobson Brothers, Inc., a Washington State corporation with its principal place of business in Seattle, Washington, is the licensee of the patent in suit. This corporation is owned by I. C. Jacobson, Alan Jacobson, Robert Brog, and Bryan Jacobson. The plaintiffs Elisa E. Jacobson (executrix of the estate of I. C. Jacobson) Sofus T. Jacob-

---

* Whereas the court adopts the judge's separate findings of fact, which are set forth in his report filed November 6, 1974, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. Plaintiffs' claim to recover compensation under 28 U.S.C. § 1491 for damages sustained as a result of an alleged breach of an implied contract relating to the subject matter of the patent in suit was dismissed, with prejudice, by stipulation of the parties.

son, and Isidor R. Jacobson are the owners of the patent in suit.[2]

The patent in suit relates to an underwater salvage device. It consists of a closed circuit television camera mounted in a pressure resistant watertight chamber, the chamber being adjustably mounted on a cage or framework to permit pan and tilt movement. A plurality of illuminating lights are mounted on the framework in association with the camera and are adapted to be moved with the camera. A hoisting cable is used to suspend the entire device from a surface vessel and to raise and lower it in the water. In addition, a maneuvering system is provided to maneuver the device along the ocean floor. This system includes four maneuvering anchors with a cable attached to each anchor. Each cable passes through a separate block or pulley on the framework, up to the surface vessel, where it is attached to a cable-winding drum or winch to enable each cable individually to be wound in or payed out. In essence, the patented device is an underwater vehicle using a TV camera as an "eye" to permit the operator on the surface vessel to control the movements of the vehicle by selectively operating the winches.

Although not described in the text of the patent, the patented device has been used primarily to recover torpedoes for the U.S. Navy. In so doing, the surface vessel is first fixed in a three-point moor to minimize horizontal movement. The four maneuvering lines with anchors attached are then deployed some 300 to 400 yards from the ship, roughly 90° apart. The device is suspended over the side of the main vessel with a boom and hoist cable, and the four maneuvering lines are attached to the frame by passing them through the pulleys. The device is lowered over the side by paying out the hoist cable and the four maneuvering lines simultaneously until it is just short of the bottom. It is maneuvered by selectively taking in and paying out the appropriate maneuvering lines until, through a monitor on board the vessel, visual contact with the torpedo is made. The operator maneuvers the vehicle over the torpedo and actuates a clamp which grips the torpedo. The torpedo is then lifted to the surface.

Plaintiff maintains that three television-equipped torpedo recovery vehicles procured by the Navy, named the Solaris, SORD I, and SORD II, infringe claims 1, 2, 4, 6, and 7 of the patent. Claim 1 is as follows: [3]

An underwater television device comprising a cage structure, a supporting cable for raising and lowering said cage, a television camera adjustably mounted within said cage, illuminating means mounted in association with said camera and adapted to be moved in accordance with the movement of said camera, a plurality of cage maneuvering lines, an anchor secured to the outer end of each line, a cable winding drum for each maneuvering line on which the maneuvering line is adapted to be wound in or payed out, said drums being mounted on a surface vessel and block means on said cage for slidably securing the cage to said maneuvering lines intermediate the ends of said lines and each of said lines leading directly from its respec-

---

2. By agreement of the parties, the only issues before the court are the validity and infringement of the patent in suit with the issue of accounting, if any, deferred to later proceedings.

3. Claims 2, 4, 6, and 7, dependent on claim 1, provide:

"2. An underwater television device as in claim 1 including a first means for tilting said camera in a vertical plane and a second means for moving said camera in a horizontal plane.

* * * * * *

"4. An underwater television device as in claim 1 including means secured to said cage for grasping an object.

* * * * * *

"6. An underwater television device as in claim 1 wherein the cage maneuvering lines are three or more.

"7. An underwater television device as in claim 1 wherein the illuminating means comprises a plurality of electric lamps and said camera is mounted in a water-tight case and the electric lamps are mounted about the case and directed to illuminate the area in the view of the camera."

tive winding drum, through its respective block to its respective anchor.

Although defendant denies any infringement of the patent, there is no substance to that contention. Such differences as there are between the claims and the accused structures relate to a modified cable maneuvering system that the Navy evolved. Quite clearly, that modification is the full equivalent of the arrangement claimed and therefore, does not avoid infringement. Graver Tank & Manufacturing Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Tektronix, Inc. v. United States, 445 F.2d 323, 195 Ct.Cl. 53 (1971); Autogiro Company of America v. United States, 384 F.2d 391, 181 Ct.Cl. 55 (1967), rehearing denied, 184 Ct.Cl. 801 (1968).

The principal issue for consideration is defendant's contention that the patent is invalid for obviousness under 35 U.S.C. § 103.[4] The approach to be taken in resolving that issue was stated in Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966), in the following terms:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. * * *

See also, Ellicott Machine Corp. v. United States, 405 F.2d 1385, 186 Ct.Cl. 655 (1969).

The nonobviousness determination must, of course, be made from an assessment of the subject matter "at the time the invention was made." 35 U.S.C. § 103. Here the seeds of the invention were sown in the summer of 1955 when plaintiffs first purchased an underwater TV camera and lights for use in a potential salvage operation they had in mind. At that time, underwater TV cameras were known and had been previously suggested for underwater salvage work. In one such prior art arrangement (described in the *Wireless World* publication), a closed circuit TV camera and a bank of lights were mounted on a framework, with the camera and lights being movable as a unit. The assembly was suspended from a surface vessel by a hoist cable with the operation of the camera controlled remotely from the surface. In another prior art device (disclosed in the Hartman patent), a television camera was carried in a diving bell, along with photographic equipment, with the bell suspended from a surface vessel. The television was used to provide visual observation of the ocean floor for purposes of exploration and salvage work and the photographic equipment was used to record the objects located by the TV camera. The operation of this device was controlled remotely from the surface.

A third such device, developed by the Navy under Project Fisheye, had a TV camera, a still camera, and lights mounted on a framework, with the equipment being operated and controlled remotely from a surface vessel.

Notwithstanding the existence of these prior art arrangements, underwater television was in its infancy when plaintiffs first became interested in this field. Many of the problems they subsequently encountered, such as poor TV reception, leaking junction boxes, power and hydraulic cable problems, and shattered light lenses, stemmed from the general lack of experience by those in the business of manufacturing TV cameras and were ultimately solved by advancements made by others than plaintiffs.

4. Although defendant also alleges invalidity of the claims under 35 U.S.C. § 102, it is clear that no one publication or patent discloses all of the claimed elements arranged in the manner claimed. Not being identically "disclosed or described," the defense of anticipation cannot be sustained and resort must be had to 35 U.S.C. § 103 to determine the nonobviousness of the differences.

The major problem encountered and solved by the patent in suit arose in May 1956 when, in an attempt to view a downed airplane in 400 feet of water, considerable difficulty was experienced in maintaining stability of the TV camera and maneuvering it into position. At that time, plaintiffs were supporting the cage on which the camera was mounted from a hoist cable, with two maneuvering lines connected to the cage running to the fore and aft of the ship. This arrangement proved to be wholly unsatisfactory.

The prior art underwater television arrangements, discussed above, offered scant guidance in providing a suitable arrangement for maneuvering a TV camera in deep water. Only the Navy-developed device had a maneuvering capability and that was in the form of a propeller-driven propulsion system. The other prior art TV cameras were merely suspended by a hoist cable and could not be maneuvered at all.

However, the problem of providing stability and maneuverability for an underwater device was not a new one. Diving bells had been used for many years in deep-water exploration and salvage. In the 1930's, it had been proposed to use a system of cables, anchors, and winches both for maintaining stability of the bell against underwater currents and to afford maneuverability of the bell along the ocean floor. Two of these arrangements are disclosed in the O'Rourke and Romano patents. Both of these suspended the bell from a hoist cable with a plurality of maneuvering cables interconnecting the bell with anchors on the ocean floor. These anchors served as fixed points relative to which the bell could be maneuvered by operation of winches for winding up or paying out selected maneuvering cables. In O'Rourke, the winches were on the diving bell and were operated by the occupants of the bell, while Romano placed the winches on the surface vessel where they were operated as directed by the occupants in the bell.

This, then, was the state of the art when, in late 1957, Jacobson solved his stability and maneuverability problem by developing the system disclosed in his patent.

In 1958, the Navy opened a torpedo test range in Dabob Bay, near Seattle, Washington, the depth of that range being about 600 feet, a depth substantially greater than a diver could reach. Prior to that time, the Navy had tested its torpedoes at depths that were sufficiently shallow to permit divers to retrieve them. However, with the advent of deep-running torpedoes, much deeper test ranges were needed.

In 1958, plaintiffs heard a rumor of a sunken torpedo in Dabob Bay. Although they had given no thought to torpedo recovery prior to that time, they offered their services to attempt recovery of that torpedo. The Navy accepted and plaintiffs ultimately were successful in recovering the torpedo, using the device disclosed in the patent. This was the first successful recovery by anyone of a torpedo in deep water and it demonstrated that the system Jacobson had developed would hold the camera firmly against underwater currents while permitting incremental movement of the camera along the ocean floor.

The equipment disclosed in the patent in suit was used by plaintiffs in hundreds of successful torpedo recoveries for the Navy over the next few years. In these recoveries, plaintiffs worked under contract with the Navy and received numerous letters of congratulations on their work, which saved the Navy very considerable sums of money. In addition to torpedoes, plaintiffs also recovered from deep water different types of bombs and missiles.

Subsequent to their first successful torpedo recovery, plaintiffs offered to sell their equipment to the Navy. The Navy declined the offer, electing instead to embark upon a program of developing its own torpedo-recovery equipment. Under this program, the Navy tried a number of approaches, all of which were failures. Ultimately, it procured the Solaris, which employed a TV camera and a torpedo-gripping claw but which was

designed to be maneuvered by propellers, much in the same manner as the earlier Navy Project Fisheye. This, too, was a complete failure, largely due to the instability of the maneuvering system. Ultimately, the propellers were removed from the Solaris and a cable-maneuvering system of the same type as that used by plaintiffs was employed. With this modification, the Solaris was successful. Thereafter, the Navy procured two more recovery vehicles, both named SORD, each of which employed a cable-maneuvering system for maneuvering the vehicle.

Against this background, defendant contends that claim 1 merely defines a combination of old elements that was obvious to anyone having ordinary skill in the art of underwater-salvage work at the time the invention was made. Plaintiffs assert that the combination of claim 1 was unobvious to one of ordinary skill in the field of deep-water recovery of torpedoes and that the commercial success achieved by plaintiffs, together with defendant's abortive attempts at development of a different system of torpedo recovery, are cogent evidence of this nonobviousness.

■■ It is at once apparent from the competing arguments of the parties that they are in disagreement as to what is the pertinent art. As is so often the case, plaintiffs define the art narrowly while defendant contends for a much broader definition. In resolving this issue, it is the claims that are the measure of the invention and the obviousness issue must be resolved on the basis of what is claimed. Kemode Manufacturing Co. v. United States, 347 F.2d 315, 171 Ct.Cl. 698 (1965). In looking to the claims, it appears that plaintiffs' definition of the pertinent art is too restrictive. The claims describe the invention broadly as an "underwater television device" and that is the title of the patent.

The specification refers to the invention as an underwater-scanning mechanism. Further, the operation of the device, as described in the patent, is phrased in general terms and contains no reference whatever to deep-water torpedo recovery. Thus, the claims, both by their terms and when construed in light of the specification, are not restricted to apparatus for deep-water recovery of torpedoes. Moreover, the facts are that Jacobson made his invention before the problem of deep-water recovery of torpedoes had even arisen. Accordingly, the art pertinent to an evaluation of the obviousness of these claims is not limited to that field. Application of Sebald, 268 F.2d 430, 432, 46 CCPA 964 (1959). Among the art that is pertinent are the O'Rourke and Romano patents, particularly with respect to their teachings of maneuvering systems for maneuvering underwater devices.

■ In view of the pertinent prior art, the differences defined by the subject matter of claim 1 reside principally in two areas. None of the prior art discloses a cable-maneuvering system in combination with a frame-mounted underwater TV camera and lights. Nor do the prior art cable-maneuvering systems, specifically those used with the underwater devices of O'Rourke and Romano, correspond exactly to the arrangement of cables, pulleys, winches, and anchors specified in claim 1. It is these differences, but in the context of the claimed subject matter as a whole, upon which the inquiry into the obviousness of claim 1 must focus.[5]

■ The determination of whether these differences are sufficient to satisfy the requirement of nonobviousness contemplated by § 103 must be made with reference to "a person having ordinary skill in the art." A finite quantitative definition of this ordinarily skilled person is difficult at best. Reeves Instru-

5. To focus only on the differences, without placing those differences in the context of the invention as a whole, would render almost every invention unpatentable since those differences, necessarily comprised at least in large part of old elements, could always be found in some context. It is the selection and employment of those elements in the claimed combination that must be scrutinized from the standpoint of obviousness. B. G. Corp. v. Walter Kidde & Co., 79 F.2d 20, 22 (2d Cir. 1935).

ment Corp. v. Beckman Instruments, Inc., 444 F.2d 263 (9th Cir. 1971), cert. denied, 404 U.S. 951, 92 S.Ct. 283, 30 L.Ed.2d 268; Reiner v. I. Leon Co., 285 F.2d 501 (2d Cir. 1960). Rather the various prior art approaches employed, the types of problems encountered in the art, the rapidity with which innovations are made, the sophistication of the technology involved, and the educational background of those actively working in the field are among the factors which will ofttimes aid in developing a picture of what is the level of skill of the ordinary person in an art. Considerations such as commercial success and the failure of others, characterized as "secondary" in *Graham*, are nonetheless invaluable as real-life indicia not only of the level of skill in the art but also in the ultimate determination of validity. *See, e. g.,* Safety Car Heating & Lighting Co. v. General Electric Co., 155 F.2d 937, 939 (2d Cir. 1946).

In this case, there is little evidence, other than the published prior art, bearing on the level of skill in the art. The problem of maintaining stability against underwater tides and currents was long known to those working with underwater devices, having been expressly recognized and defined by O'Rourke as early as 1934. In addition, O'Rourke had disclosed to the art a cable, winch, and anchor arrangement which not only provided stability but also afforded maneuverability of the bell along the ocean floor. In 1935, Romano disclosed a somewhat different maneuvering system for a diving bell, again using cables, anchors, and winches. With the advent of television and at least by 1952,[6] underwater TV cameras and lights had been adopted as a technique for underwater scanning in salvage operations in lieu of sending a man down to survey the ocean floor.

In view of this knowledge, which must be deemed to have been possessed by those working with underwater-salvage devices, it is difficult to find anything unobvious in the selection and use of a cable, winch, pulley, and anchor system for maneuvering an underwater TV camera. Jacobson, confronted with problems of underwater currents and tides, adopted that combination for reasons of stability and maneuverability. O'Rourke, confronted with precisely the same problem, advanced the same solution for precisely the same reasons. While O'Rourke's vehicle was a manned diving bell, there is nothing in the record that suggests that a frame-mounted TV camera presented problems any different in kind or degree from those confronting O'Rourke. In the absence of such evidence, the conclusion is inescapable that one ordinarily skilled in the art would readily recognize that the cable system of O'Rourke could be used to provide stability and maneuverability for any type of underwater apparatus, including a TV camera.

In reaching that conclusion, due consideration has been given to the evidence which demonstrates, beyond question, that the cable-maneuvering system was the key to the success, both of plaintiffs' equipment and that of defendant's. Before plaintiffs adopted such a system, their TV camera could not be used satisfactorily in deep water and, quite clearly, the failure of the alternative approaches attempted by defendant confirm the importance of this system to a workable combination. But, notwithstanding its importance, the idea of a cable-maneuvering system for stability and maneuverability was an old one. Hence, while that concept may have solved the problem, it is considered to have been an obvious concept to employ in view of the prior teachings of O'Rourke. Ellicott Machine Corp. v. United States, *supra.*

There being nothing unobvious, in light of O'Rourke, in using a cable-maneuvering system for controlling an underwater television device, there remains the question of whether the particular maneuvering system described in claim 1 is unobvious. When compared with

---

6. One exhibit suggests that this was done as early as 1947. The Hartman patent, dated November 10, 1936, suggests even an earlier date.

O'Rourke, the difference between the two systems dissolves largely to a matter of where the winches are placed. O'Rourke had the winches on the diving bell with the cables running out to the anchors, while Jacobson placed the winches on the surface vessel and ran the cables through pulleys out to the anchors.

The position of the winches appears to be largely a matter of choice, particularly in view of Romano who suggested placing the winches on a surface vessel. Since the Jacobson device, unlike O'Rourke, is not manned, there would seem to have been no reason even to consider placing the winches on the underwater device. Indeed, this would have created an additional problem, that of how to control the winches from the surface.

Irrespective of where the winches are located, both the patented arrangement and O'Rourke use a maneuvering system based on the principle of maneuvering cables secured to angularly spaced anchors, which serve as fixed points, with maneuvering of the underwater vehicle being accomplished by selective winding up and paying out of the cables so that the vehicle is maneuvered relative to those fixed points. The winches only provide the mechanism for winding up and paying out the cable. Merely moving the winches of O'Rourke to the surface vessel would necessarily result in the cables passing from the anchors, through pulleys on the underwater vehicle, to the winches, all as set forth in the claim. There is nothing in either Romano or O'Rourke that would suggest any problem in placing the winches on the surface vessel; nor is there any evidence in the record suggesting that by so doing, either a longstanding problem was solved or that this was the key to the development of a successful maneuvering system. It simply appears to have been a convenient, and indeed the most logical, place to position the winches when the underwater device is unmanned.

Plaintiffs, with justifiable pride, point out that the Jacobson apparatus was the first device to recover torpedoes in deep water. It is also undoubtedly true that, due to their equipment, developed on their own initiative and with their own funds, the public has been benefited by the saving of substantial sums.[7] For this, they are to be commended and their contribution to the public good should not, in any way, be minimized. But the issue before the court is one of patentability and, on that issue, there is a very substantial public interest as well. Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). It is the longstanding public policy of this country that everyone is to be free to practice that which is in the public domain, Anderson's-Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945), and only those patents which meet the statutory, and constitutional, standards of patentability are to be sustained. Graham v. John Deere Co., *supra*. In the application of those standards, the United States stands in the same position, no better and no worse, as any private defendant in a patent infringement suit. *See, e. g.*, United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). For this reason, the benefits derived from plaintiffs' achievement, except and to the extent they illumine the issue of obviousness of the claimed subject matter, are not a sufficient reason to sustain the claim as against the defendant here. Ellicott Machinery Corp. v. United States, *supra*; Martin-Marietta Corp. v. United States, 373 F.2d 972, 179 Ct.Cl. 70 (1967); Hanks v. Ross, 200 F.Supp. 605 (D.Md.1961).

Nor is the apparent obviousness of the claimed arrangement altered by

---

**7.** Of course, through their many contracts with the Navy, plaintiffs have been compensated for all of the torpedo-recovery work they performed.

the commercial success enjoyed by Jacobson's apparatus. Although it has been said previously, it bears repeating that the invention was made prior to the time when the problem of recovering torpedoes in deep water arose and, hence, it was not a response to a long-felt need in that field. At the time the invention was made, Jacobson's contribution, over and above the teachings of O'Rourke, consisted of his specific arrangement of cables, pulleys, and winches in an underwater-salvage device. Since, to be of value on the issue of obviousness, the commercial success must be shown to be attributable to the patentee's claimed contribution, Palmer v. United States, 182 Ct.Cl. 896 (1968), it was incumbent on plaintiffs to show that it was Jacobson's arrangement of the winches, cables, and pulleys, at least in substantial part, that made his device a success in the recovery of torpedoes. This they have failed to do. In the absence of some evidence of this character, there is as much reason to accord the commercial success to the teachings of O'Rourke incorporated in the Jacobson device as there is to attribute it to Jacobson's contribution.[8]

In summary, it is concluded that the differences between claim 1 and the prior art are such that the subject matter, when viewed as a whole in the light of all circumstances, would have been obvious to one of ordinary skill in the art.

Claims 2 and 7 add details regarding the mounting of the camera and lights and do not lend anything of patentable significance to the claimed combination. Providing an adjustable mounting for the camera so that it is capable of pan and tilt movements must, as a broad concept, be considered an obvious expedient.

Claim 6 merely specifies that at least three maneuvering lines are employed.

O'Rourke discloses the use of three cables and Romano suggests that three or four lines be used.

Claim 4 adds the limitation of a grasping mechanism for grasping an object. This too is a well-known expedient, being disclosed in Romano who employed mechanical arms on the diving bell for the purpose of grasping and lifting objects. Adding a grasping mechanism to the combination of claim 1 would have been an obvious technique for picking up objects from the ocean floor.

Having concluded that claims 1, 2, 4, 6, and 7 cannot be sustained in view of the prior art, it follows that the petition must be dismissed.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and the petition is dismissed.

---

**8.** The evidence regarding the Navy's failures does not supply the missing link since it appears that the Navy's efforts were largely directed toward developing recovery apparatus that did not employ the rather time-consuming and laborious cable-maneuvering approach. The modified cable-maneuvering system they ultimately adopted indicates that it was the principle, not Jacobson's specific arrangement, that was critical to a successful device.