**Krekel KARCH**

v.

**The UNITED STATES.**

No. 298–69.

United States Court of Claims.

Dec. 14, 1977.

John E. Juergensmeyer, Elgin, Ill., attorney of record, for plaintiff; Juergensmeyer, Zimmerman & Smith, Elgin, Ill., John Carlon and Carlon & Carlon, Normal, Ill., of counsel.

Frank R. Perillo, Princeton, N. J., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before COWEN, Senior Judge, DAVIS and KUNZIG, Judges.

OPINION

PER CURIAM:

Trial Judge Colaianni has decided that plaintiff's patent relating to erosion and flood control and land reclamation is invalid for obviousness. Plaintiff has excepted to that determination. The court has considered the briefs and oral argument, and now adopts the trial judge's opinion (with minor modifications) as hereinafter set forth, as the basis for its judgment in the case.* Accordingly, it is concluded that plaintiff is not entitled to recover and the petition is dismissed.

---

* While the court adopts the trial judge's separate findings of fact, as set forth in his report filed January 27, 1977, they are not printed herein since such facts as are necessary to the decision are contained in the opinion set forth *infra*.

Trial Judge COLAIANNI's opinion, with minor modifications, is as follows:

COLAIANNI, Trial Judge:

Charging that the United States has used the invention covered by his patent, entitled "Erosion and Flood Control and Land Reclamation," without his consent or authorization, plaintiff brings this action pursuant to 28 U.S.C. § 1498 for reasonable and entire compensation. Trial was limited to the issues of patent validity and infringement. The amount of plaintiff's recovery, if any, is deferred until after a final ruling by this court on the questions of validity and infringement.

The patent in suit, United States Patent No. 2,745,768, hereinafter referred to as the "Karch" patent, issued on May 15, 1956,[1] to Krekel Karch, who throughout its term was the sole owner of all right, title and interest therein.

Defendant denies plaintiff's claim on various grounds, including that the claimed process was known or used in public, or described in a printed publication within the meaning of 35 U.S.C. § 102(a),[2] more than 1 year prior to the date of plaintiff's invention. In addition, defendant urges that the invention was obvious to one of ordinary skill in the art and thus invalid for failure to meet the standard of 35 U.S.C. § 103.[3] Finally, defendant maintains that it is not liable to plaintiff because it has not used the process covered by the single process claim of the Karch patent during the relevant accounting period.

For the reasons stated hereinafter, it is concluded that the patent in suit is invalid since the process would have been obvious to one of ordinary skill in the art at the time that plaintiff made his invention.

### The Karch Patent

The Karch patent relates to erosion and flood prevention and control, and, as well, to the reclamation of land which has been damaged by the failure of a landowner to practice necessary water control measures. Briefly stated, the method employs the well-known concept of slowing the velocity of silt-laden water to such a degree and for such a length of time, that a large proportion of the silt will be deposited. A substantial proportion of the desilted water is soaked up by the terrain to increase the land's water table, while the remainder harmlessly passes along its normal flow course. In order to collect and otherwise slow the velocity of the silt-laden water, a barrier is constructed across a gully that is to be eradicated. In this manner, a dry basin is formed behind or upstream of the barrier. Prior to forming the barrier, a horizontal conduit has been placed such that it will ultimately be positioned transversely below the barrier. The inlet of the conduit is placed at approximately the lowest level of the dry basin, while the outlet may discharge into another dry basin, stream, or lake.

The arrangement is such that in times of rainfall water will flow rapidly down the gully, at a velocity that is dependent upon such factors as the amount of rainfall and the slope of the gully. The water carries in suspension soil or silt washed from the land drained by the gully. Upon the silt-laden water initially reaching the barrier, its

---

1. The term of a patent is 17 years; accordingly, the Karch patent expired on May 15, 1973.

2. "§ 102. Conditions for patentability; novelty and loss of right to patent

   "A person shall be entitled to a patent unless—

   "(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or"

3. "§ 103. Conditions for patentability; non-obvious subject matter

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. * * *."

movement will be interrupted and a pool will be formed in the basin. The slowing of the water results in the deposition of suspended silt. As additional water enters the basin, it encounters the water previously collected and in turn is sufficiently slowed so that its silt will be deposited on the floor of the gully at the point on the periphery of the water present in the basin where the additional silt-laden water enters. As additional water is collected, the periphery of the pool is continuously changing, so that successive increments of silt will be deposited at the everchanging water periphery.

The water which is collected in the basin will be discharged by way of the conduit. However, the conduit inlet can be restricted so that the rate of discharge through the conduit is substantially less than the normal rate of flow into the basin. In this manner, even normal rains will cause a pool or lake to be formed temporarily in the dry basin. In the event that the dry basin is being cultivated, the design is such that the accumulated water will be emptied from the basin within ½ to 2 days and thus prevent damage to the crop. In order to ensure that an inlet small enough to cause a temporary lake in the basin in light rains will nonetheless empty the basin within 2 days of heavy rains, a spillway is provided to carry around the barrier that water which is in excess of the volume which the inlet can handle in this period.

In operation, the silt will initially fill the irregularities on the floor of the basin. However, as a result of repeated depositions of silt, the floor of the basin will be built up. It therefore will become necessary, as the process continues, occasionally to raise the inlet end of the conduit to ensure that the inlet level is level with or slightly above the accumulated silt level which has become the floor of the dry basin.

### The Patent Claim

The single method claim of the Karch patent, in indented form for ease of understanding, reads as follows:

The method of stopping erosion by silt-containing water flowing in a gully, and causing deposition of silt therefrom, comprising:

erecting a water barrier across said gully to provide a temporary retaining basin for at least some of said water, said barrier comprising a conduit positioned substantially horizontally beneath and transversely of said barrier, the inlet of said conduit being at the lowest point in the basin;

providing a spillway near one end of said barrier of lower elevation than the top of said barrier;

receiving silt-containing water in said basin; causing water to collect in said basin by discharging water from the floor of said basin solely through said conduit at a flow volume substantially less than that at which water enters said basin, and thereby causing deposition of silt from said water on the floor of said basin, in substantially successive increments at the ever-changing water periphery; and

continuously discharging desilted water from said conduit until said basin is empty;

whereby erosion in said gully is eliminated and said basin is thereafter operable as a safely cultivatable dry basin, wherein the basin floor slopes upwardly from the conduit level to the ultimate silt level.

### Scope of the Claim

Defendant has contended that major flood control projects built by the Government since the 1920's [4] anticipate the Karch claim and thus render it invalid for lack of novelty pursuant to 35 U.S.C. § 102. Such projects were primarily concerned with the formation of temporary lakes in rains so heavy, i. e., 2, 5, 10, or 50-year storms,[5] that flood prevention measures become appropri-

---

4. In particular, defendant points to the Miami Conservancy Project near Dayton, Ohio, and the Little Sioux Project in Woodbury and Monona Counties of Iowa.

5. These are storms of such duration and intensity that past experience has shown that on the average they will occur respectively only once in a 2, 5, 10, or 50-year period.

ate. The flood control structures were not intended and indeed did not result in the formation of temporary lakes in what may be termed a normal or typical rain. Rather, the flood control dams were designed to retain the high levels of water resulting from the unusual storms and thus prevent rivers from overflowing their banks and causing loss of life and property. The retained water would thereafter be discharged at a metered rate which could be conveniently and safely accommodated by the river.

Plaintiff, to the contrary, contends that methods whose utility is limited to unusual heavy rain conditions are not within the Karch method. The Karch method, plaintiff contends, is limited to the collection of silt in normal, everyday intensity rains. The large scale, heavy rains cannot be retained by the water barrier of the method in suit, but instead flow over or around the barrier by way of the spillway.

Looking to the Karch specification to determine the context in which the claims are to be read, one finds:

This conduit is so designed that the rate of flow through it is substantially less than the normal rate of flow of water into the basin.

\* \* \* \* \* \*

\* \* \* thus, if the conduit has been made too large, any simple, conventional arrangement can be made to reduce the area of the inlet opening, so that normal rainfalls will result in the formation of a temporary lake in the dry basin.

As explained by the patent specification, in heavy rains, Karch's spillway carries silt-containing water around the structure and thus the Karch method is ineffective to collect silt from a large proportion of the water that reaches the barrier in heavy rains.

Looking to the specification of a patent to determine the metes and bounds of a claim is a longstanding practice which is resorted to by all courts, including the Supreme Court, which in *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871 (1917), noted that "[t]he scope of every patent is limited to the invention described in the claims contained in it, read in light of the specification." The Supreme Court recently restated and reemphasized this principle in *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572, 148 U.S.P.Q. 479, 482 (1966), where it stated: "[I]t is fundamental that claims are to be construed in the light of the specification and both are to be read with a view of ascertaining the invention." It is, accordingly, concluded that the Karch method is limited to methods which function in normal rains, and excludes those methods which function only in heavy rain or flood situations.

### Defendant's 35 U.S.C. § 102 Defenses

■ Reading the Karch method, as we must, to be ineffective in heavy rain situations, emasculates defendant's 35 U.S.C. § 102 arguments. Specifically, each of the flood control projects relied upon, *i. e.*, the Little Sioux Project in Iowa, the Germantown and Huffman Dams in the Miami Conservancy District, Farmers' Bulletin No. 1234, published by the U.S. Department of Agriculture, and, as well, the soil-saving dry dam on the Rollene Farm in Iowa, fail to disclose each and every step of the claimed invention or obtain the same result as the Karch method.

While in unusual and heavy rain situations some silt may be collected behind these dams, the collection at best occurs only rarely and most often only after a 2, 5, 10 or 50-year storm. The above projects were undeniably not intended to collect silt and operate in the manner proposed by the Karch method for the normal everyday rains. In fact, the openings or conduits used to carry the pooled water under the barriers of these flood control projects are of such dimensions that a temporary pond or pool cannot occur except in unusual 2, 5, 10, or 50-year storms.

While it is true that the builders of the dams and flood control projects realized that silt would be collected in cloud-bursting-type rains, the collection of silt was not desired or intended and was only an accidental by-product of their immediate goal of flood control. To the contrary, Karch intended his method to be effective to desilt water that drains into a gully from an average or typical everyday rain.

It must, accordingly, be concluded that the incidental and occasional collection of silt by the flood control projects cited by defendant do not operate in the manner required of the claim in suit, and thus do not anticipate within the meaning of 35 U.S.C. § 102(a).

### Defendant's 35 U.S.C. § 103 Defense

In addition to its position that the Karch patent is anticipated by certain prior art and thus invalid for lack of novelty, defendant also argues that the patent is obvious in view of the prior art and thus invalid and unenforceable.

█ In evaluating validity under 35 U.S.C. § 103, it is necessary to consider the following three factors:

(1) the scope of the prior art;

(2) the differences between the prior art and the claims in issue; and

(3) the level of ordinary skill in the art. Further secondary considerations, such as commercial success, satisfying a long-felt need, or the failure of others, reflect upon the determination of obviousness under 35 U.S.C. § 103. *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 U.S.P.Q. 459 (1966).

It is, of course, essential in evaluating an invention against the standards of 35 U.S.C. § 103 that hindsight and the disclosure of the patent in suit not be resorted to. *See Jamesbury Corp. v. United States*, 518 F.2d 1384, 1398, 207 Ct.Cl. 516, 542 (1975). Adherence to that principle is assured in this instance since all the steps of the Karch method, or the motivation for a person skilled in the art to supply the missing steps, are present in the prior art.

After reviewing the differences between the prior art and the claim, the level of ordinary skill in this art, and the scope of the prior art, and after noting that such secondary considerations as are present here are insufficient to outweigh these factors, it becomes clear that the Karch patent is invalid under 35 U.S.C. § 103.

### Scope of the Prior Art

█ As explained by the Farm Division of the Miami Conservancy District, in The Beneficial Effect of Backwater Overflow, Farm Circular No. 2 (1919), the improved fertility of farm fields resulting from the presence of silt deposited in times of flood has long been recognized. In addition to the recognition by the art of the benefits of silt, the desirability and the feasibility of collecting it on farm fields has also been a long-standing practice as explained by the following publications: The Beneficial Effect of Backwater Overflow, *supra* ; Texarkana Pipe Co., Vitrified Clay Sewer Pipe and Drain Tile on the Farm (circa 1920); U.S. Department of Agriculture, Farmers' Bulletin No. 1234 (1923); R.H. Sparks, United States Patent No. 1,083,148 (1913); and U.S. Department of Agriculture, Farmers' Bulletin No. 1669 (1931).

Further, the following publications show the recognition by the art of collecting silt to fill erosion gullies in fields: Farmers' Bulletin No. 1234 *supra* ; and Vitrified Clay Sewer Pipe and Drain Tile on the Farm, *supra*. Farmers' Bulletin No. 1669, *supra*, also teaches the value of retaining silt on farm terraces.

Structures for collecting silt are shown in both Vitrified Clay Sewer Pipe and Drain Tile on the Farm, *supra*, at 2 and 7–9, and in Farmers' Bulletin No. 1234, *supra*, at 23. In each of these structures an earthen barrier is placed across the gully or depression to be filled with sediment. Silt-containing water flows down the gully and is collected behind the barrier. A layer of silt is left behind as the collected water soaks into the soil and previously-collected sediment. A drop inlet which is about 2 or 3 feet below

the top of the dam functions as an emergency spillway to limit the height of the water. When the height of the water in the basin exceeds the height of the drop inlet, the excess flows into the drop inlet and is carried through a horizontal sewer pipe that extends beneath and transversely of the earthen barrier substantially as shown hereinbelow:

Set pipe curve on firm bed of stones      Clear stones from stream bed and tamp soft earth firmly around and under pipe

Lengthwise section of gulley showing cross section of earth dam and installation of vitrified clay sewer pipe underflow

Further, the Vitrified Clay Sewer Pipe and Drain Tile on the Farm article, *supra*, at 11, teaches that in some climates and under certain conditions of soil, the basin behind the dam will be too wet to cultivate. It thus becomes necessary to remove the water trapped in the basin more quickly. The article suggests placing a line of drain tile below the earth to collect and remove the water from the saturated soil.

Also part of the prior art is the previously-mentioned structure built by the Soil Conservation Service on the Rollene farm, Franklin County, Iowa, in 1950 for the purpose of stopping the advance of an erosion gully. The Rollene farm illustrates another method for removing the water from behind an earthen barrier. The structure consists of an earthen barrier across a gully with a 12″ tile drain passing beneath it. The tile is supplied by an 18″ drop inlet located at the lowest point of a basin. An auxiliary spillway to carry off excessive amounts of water and thus prevent damage to the barrier is also provided near one of its ends. It appears that the Rollene structure successfully eliminated erosion in the gully by slowing the water that flows in the gully from an 85-acre watershed. Due to the successful operation of the barrier, grass is now growing in the gully downstream of the barrier, and the upstream basin has not been washed away even in very hard rains.

Even though the 18″ drop inlet is too large to enable a pool from forming in the basin in normal everyday-type rains, temporary ponding of the water does occasionally occur in heavier rains. As a result of this occasional ponding, 3 to 6-acre feet of silt have been collected in the basin in the period from 1950 to 1975. This amount of silt is considered negligible for this structure.

As previously mentioned, the 18″ drop inlet is so large that it is able to accommodate the water which collects from most rains even though the barrier serves an 85-acre watershed. As a result, temporary ponding occurs, at most, only two or three times a year. The normal everyday-type rains are removed from the basin so quickly that silt is not given time to deposit. In order to cause a temporary pond which takes 12 hours to drain, for example, it is necessary to have a rain of a 10-year intensity on the Rollene farm.

### The Differences Between the Prior Art and the Claim

In the main, the method illustrated by Vitrified Clay Sewer Pipe and Drain Tile on the Farm, *supra* differs from the Karch method only in the rate and structure by which the water is removed from the basin. This prior art method appears to rely upon water soaking into the soil to remove the water. The soaking process may require a long period of time to complete and the ground in the meantime may become soggy. This prior art reference also does not show an inlet into the tile conduit at the lowest point of the basin or a spillway near one end of the barrier.

On the other hand, the Rollene structure contains most of the ingredients required by the Karch method, including an inlet into the tile conduit at the lowest point of the basin and a spillway near one end of a barrier at a lower elevation than the top of the barrier. As a result, the water flowing into the basin passes, by way of the inlet, into the horizontal conduit below the barrier. However, the Rollene method is designed for heavy rains, and since the ratio of the inlet size to the watershed it services is much larger than in the Karch method,

the method does not collect silt in the normal rain situation as required by the Karch claim.

### Level of Ordinary Skill

A review of the prior art demonstrates that one of ordinary skill in this art fully appreciates the properties of silt and the beneficial effect of having silt deposited upon his fields. As pointed out in The Beneficial Effect of Backwater Overflow on Agricultural Lands, *supra*, silt has long been recognized as a worthwhile fertilizer. The pamphlet states that lands subject to periodic submergence are generally the richest. Further, it points out that such lands maintain their great fertility without crop rotation or application of manure or other fertilizers. Indeed, fields subject to the deposition of silt are often more productive than fields to which manure and other fertilizers are artificially applied. Accordingly, one of ordinary skill in the farming arts wishing to use his fields to produce crops would obviously encourage the deposition of silt on his fields.

The documents of record also convincingly demonstrate that the prior art recognized that the amount of silt which can be carried by water is proportional to its speed. Thus, as the speed of flowing water increases silt is picked up and as the speed decreases silt is deposited. Silt is deposited most thoroughly and quickly from water which has been temporarily retained in a standing pool as in the example discussed and illustrated in the Vitrified Clay Sewer Pipe and Drain Tile on the Farm Pamphlet, *supra*.

Moreover, it was equally well known that water standing on crops for too long a period will damage the crops. A trade-off between the desire of having the water stand in the basin for a long period of time in order to recover as much of the silt as possible on the one hand, and, on the other hand, the desire of removing the water from planted fields to avoid crop damage would obviously be recognized by a person of ordinary skill in the art.

Thus, if in using the Vitrified Clay Sewer Pipe and Drain Tile on the Farm, *supra*, method and structure for the desilting of rainwater it turned out that the land was too soggy for cultivation, it is obvious that ways for draining the water off the land more quickly would be resorted to. One way, the way suggested by the Rollene farm, is to provide an inlet to the tile buried beneath the barrier at the lowest point of the basin. Further, keeping in mind the desired goal of achieving maximum desilting without crop damage, one of ordinary skill would obviously make the drop inlet small enough to cause temporary ponding and desilting for normal rains, but large enough to remove the water before crop damage set in.

■ Thus, one of ordinary skill in the farming arts following the suggestions of Vitrified Clay Sewer Pipe and Drain Tile on the Farm, *supra*, for cultivating the land covered by silt deposited behind a soil-saving dam, would find it obvious to place an inlet to the tile system at the lowest point of the basin as taught by the Rollene structure to dispell a boggy condition. Further, such person would make the inlet small enough to cause the formation of a temporary pool to maximize the desilting operation, but not so small that the water would be retained so long that damage to the crops occurs. Accordingly, all of the steps called for by the Karch method would have been obvious, within the meaning of 35 U.S.C. § 103, to a person of ordinary skill in the art.[6]

### CONCLUSION

Based on the above analysis, it must be concluded that claim 1, the only claim of

---

6. Plaintiff stresses a number of alleged secondary considerations (commercial success in central Illinois where plaintiff lives; past failures of others; contemporaneous reactions of experts; purported satisfaction of a long-felt need of farmers) but, here as in *Graham v. John Deere Co., supra*, 383 U.S. at 36, 86 S.Ct. at 703, "these factors do not, in the circumstances of this case, tip the scales of patentability." It is settled that where obviousness is clear (as in the present case), such secondary considerations cannot turn invalidity into validity. *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282–83, 96 S.Ct. 1532, 47 L.Ed.2d 784

the Karch patent, is invalid and unenforceable. The issue of infringement need not be addressed. Plaintiff is not entitled to recover, and his petition is dismissed.

---

(1976). Moreover, just as in *Graham v. John Deere Co., supra,* the favorable reception of plaintiff's alleged invention may have been due to the fact that the enthusiasts were not adequately aware of the knowledge stored in the Patent Office and other repositories of the prior art. Nor has plaintiff proved that such success as he obtained was due to his particular claimed contribution, not to other factors. *See Bourns, Inc. v. United States,* 537 F.2d 486, 495, 210 Ct.Cl. 642, 658–59 (1976); *Jacobson Bros. v. United States,* 512 F.2d 1065, 1072–73, 206 Ct.Cl. 518, 531–32 (1975). [footnote by the court]