PER CURIAM:
Both sides appeal from the judgment of the United States Claims Court* in this patent infringement suit. Appellants Orthopedic Equipment Company, Inc. (Orthopedic) and Marriott Corporation (Marriott), plaintiffs in the suit, brought this action pursuant to 28 U.S.C. § 1498 seeking compensation for the unauthorized manufacture or use by or for the United States of a nation-wide material handling system which is alleged to infringe claims 1, 2, 6, and 7 of United States Letters Patent No. 3,304,416 (the Wolf patent), entitled “Business Order Control System Apparatus.” They filed administrative claims for compensation with several Department of Defense agencies for infringement of the Wolf patent. The first of these administrative claims was filed in July 1976; none of the claims has ever been denied. The present suit was filed in the United States Court of Claims on May 6, 1977. Then Trial Judge Colaianni, after a trial, issued an opinion and findings holding that the invention set forth in claims 1, 2, 6 and 7 of the Wolf patent would have been obvious within the meaning of 35 U.S.C. § 103 and that the claims were therefore invalid. He either rejected or declined to pass upon other defenses raised by the United States. But he did decide that the plaintiffs were entitled to collect $1,181.25 as part of the reasonable and necessary costs of a certain deposition. The final judgment was that, upon payment by the United States to the plaintiffs-appellants of $1,181.25 as part of those deposition costs, the petition was to be dismissed. Plaintiffs appeal from the determination of invalidity, and defendant appeals from the award of deposition costs and also from the judge’s failure to consider, or his rejection of, most of the Government’s other defenses.
Because we agree with Judge Colaianni’s reasons for his decision that the claims were invalid for obviousness, we confine our discussion of invalidity to those points and do not consider the United States’ contentions that invalidity can be reached on other grounds. On the question of obviousness (Part I infra) our opinion incorporates, for the most part, Judge Colaianni’s opinion. We also consider (Part II infra) the issue of deposition costs.
I — Obviousness
Appellants accuse the appellee of infringing claims 1, 2, 6, and 7 of the patent in suit. Claims 1 and 2 are very similar to one another. Likewise, claims 6 and 7 are very similar to each other. The main differences between the claims are the differences which exist between these two similar groups. The parties agreed at trial to treat claims 2 and 7 as representative of their respective groups. This convention will also be followed in this opinion. However, should a peculiar aspect of either claim 1 or claim 6 affect the outcome of the determination of validity, then this fact will be emphasized.

*1007
The Claims

Wolf claims 2 and 7, presented in subparagraph form with the sequencing of the claim elements slightly rearranged from the sequencing found in the patent itself,[1] are as follows:

Claim 2

(a)(1) An electrical system
(2) for controlling the operation of a business,
(b) (1) comprising
(c) (1) a plurality of order stations,
(d) (1) means
(2) at each of said order stations
(3) for generating coded messages corresponding to the orders entered at said station,
(e) (1) a central station
(2) connected for control in turn from any of said order stations,
(f) (1) means
(2) for programming the operation of each order station to cause the transmission of the messages,
(3) in orderly fashion,
(4) to the central station,
(g) (1) a plurality of work stations
(2) at which are to be performed respective items of work called for by said messages,
(h) (1) means
(2) at said control station
(3) for recording the messages as received,
(4) and for computing numerical information
(5) based on the content of said messages,
(i) (l) means
(2) for relaying selected portions of said messages to respective ones of said work stations,
(j)(l) and means
(2) at each work station,
(3) responsive to the relayed message portions,
(4) for providing a visual display
(5) of order information pertinent to that work station.
Claim 7
(a)(1) A remote control
(2) and computing
(3) system
(4) for mercantile operations
(b) (1) comprising
(c) (1) work stations,
(d) (1) at least one order station,
(2) remote from said work stations,
(e) (1) and a central station;
(f) (1) remotely controllable
(2) order registering equipment
(3) at said central station
(g) (1) means connecting
(2) said order station to said equipment
(3) to register therein signals representing items of work to be performed;
(h) (1) automatic means
(2) associated with said central station
(3) for translating said signals into a registrable code
(4) and for appending thereto codes representative of each work item;
(i) (l) and a calculator control
(2) led by said automatic means
(3) for registering the items of work and price data individual thereto
(4) and for computing said data to provide an output total;
(j) (l) and means
(2) associated with said central station
(3) for transferring portions of said signals selectively to respective work stations
*1008 (4) to control the manifestation thereat of such work items for processing at said stations[,]
(k)(l) apparatus
(2) at each work station
(3) for registering
(4) and intelligibly manifesting
(5) the items of work to be performed, as called for by said signals[.]

The Nonobvious Subject Matter Requirement of 35 U.S.C. § 103

The traditional test, enunciated in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), for § 103 nonobviousness requires the factfinder to make several determinations. The test provides:
Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved need, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. [383 U.S. at 17-18, 86 S.Ct. at 694.]

Scope and Content of the Prior Art Summarized

Much of the prior art in the trial record consists of United States Letters Patent which were considered by the Patent and Trademark Office (PTO) during the prosecution of the Wolf patent. These patents for the most part reside within the art of information processing system hardware. A number of them draw upon the technology found in telephone line-switching devices. The technology embodied in the information processing and telephone fields tends to evolve rapidly in response to prior and concurrent developments.
The individual patents themselves disclose one or more, but less than all, of the separate Wolf claim elements. Their combined teachings disclose all of the Wolf claim elements. Several of these patents each show how to combine two or more of the Wolf claim elements. They demonstrate the facility with which the various means identified in the Wolf claims can be made to interface with each other in order to form the desired information processing devices.

The Relevant Art of the Invention in Suit

The claims in suit provide a convenient starting point for determining the relevant art. The significant claim elements which combine to form the claims in suit were well-known in the prior art as of the time of the Wolf filing date. Thus nonobviousness of these claims would arise only if they embody a combination of these well-known elements that was not obvious to one of ordinary skill in the art. One factor bearing on the determination of the relevant art is the type of skill required to understand the disclosure of the Wolf patent, which relates to information processing hardware. Beyond a rudimentary knowledge of electromechanical devices, one should be familiar with the workings of information processing systems hardware.
One of skill in the art of designing information processing systems hardware at the time of the Wolf filing date would have been familiar with telephone line-switching technology. This conclusion is apparent from the Andrews-Vibbard[2] disclosure, the Gimpel[3] disclosure, and is consistent with the fact that the technology used for the routing of signals in the early models of information processing systems hardware was borrowed from telephone line-switching technology.
A second factor bearing on the determination of the relevant art is the type of art applied to the claims by the PTO. As al *1009 ready noted, much of this art deals with information processing systems hardware and telephone line-switching technology.
In determining the relevant art of the claims in suit one looks to the nature of the problem confronting the inventor. Weather Engineering Corp. of America v. United States, 614 F.2d 281, 287, 222 Ct.Cl. 322 (Ct.Cl.1980). The appellants’ expert, when asked to state the concept embodied in these claims that was not already present in the prior art as of the filing date of Wolf, said:
The concept of the message identifying an item of work being transmitted through a central station — or is transmitted to a central station, and then the use of the item identifier to route the message onto an appropriate work station with the ability, at the central station, to also perform numerical computations where the — at least some of the operands for that computation are also determined by the item description code entered at the work station, or — at the order station.[4]
In other words, appellants allege that one source of the patentability of the claims in suit is the way that the apparatus, as defined by the Wolf claims, uses the coded input information to make two separate types of decisions without the aid of direct human intervention at the time when the decisions are made. The first determination involves selecting price information from a data storage apparatus and appending the price information to the item input information. The Wolf system looks at the item code, and based on this code it is able to pick out the price of this item from the price information stored in the memory registers of the central station. It then associates this price information with the item code in all subsequent processing of the item input information. The hardware employed to perform this selection was well-known in the art of information processing systems hardware design as of the filing date of Wolf.
The second determination involves selecting the appropriate route for transmission of the coded input information to the proper work station, as well as to the calculator for numerical computations. The system’s route selection is made depending upon the identity of the coded input information. The hardware employed to perform this selection was well-known in the art of designing telephone line-switching hardware.
In view of the foregoing factors, it would seem that one can come no closer to pinpointing the relevant art of the Wolf claims than by choosing the art of information processing systems hardware. We conclude that the relevant art of the Wolf patent claims resides in the field of information processing systems hardware.
Additional support for this conclusion comes from the fact that the appellants chose as their chief witness a person whose primary experience was in the computer hardware field,[5] which is the major component of information processing systems hardware. Appellants’ assertion of warehousing as the relevant art is unpersuasive. In defining the significance of the invention, appellants’ chief witness, Mr. Nikolai, relied on his experience in the computer field, not on any expertise in the field of warehousing. In fact, Mr. Nikolai did not possess any expertise in the warehousing art, yet the appellants advanced his testimony in their rebuttal of the appellee’s defense of invalidity for lack of nonobviousness of the Wolf claims. If the appellants truly believed that the relevant art was warehousing, it appears reasonable to expect that they would have sought to rebut the defendant’s § 103 charge of obviousness in the art of information processing systems hardware by demonstrating the nonobviousness of the claims in the art of warehousing. To do the latter appellants could not advance the testimony of Mr. Nikolai, who *1010 was totally unfamiliar with the warehousing art. However, the appellants’ choice of Mr. Nikolai was not in fact ill-advised; their actions speak louder than their words in this instance, and their actions bolster the conclusion that the relevant art is in the field of information processing systems hardware.

Section 103 Defense Based on Nelson-Robinson and Andrews-Vibbard

The one of appellee’s § 103 defenses that, was accepted by the trial judge is based upon the combined teachings of two United States Letters Patents, Nos. 1,974,191 and 2,977,048.
United States Letters Patent No. 1,974,-191 entitled, “Merchandise Control System,” was filed by Martin L. Nelson and Harold C. Robinson on April 18, 1932 (the Nelson-Robinson patent). It was classified by the PTO in class 178, subclass 4, and issued on September 18, 1934. It was not considered by the PTO during the prosecution of the claims in suit.
The Nelson-Robinson apparatus includes both order stations and work stations. The work stations perform several functions, namely: credit checks, inventory record monitoring, and transaction documentation. Nelson-Robinson envisions a customer bringing merchandise he wants to purchase to a sales clerk at an order station. Attached to the merchandise is a merchandise display card which contains information coded as a pattern of perforations. The sales clerk operates a transmitter which receives the punched merchandise display card together with a sale clerk’s card and a cashier’s card, each of the three cards containing information in the form of punch codes. The transmitter in effect reads the punched information by completing certain circuits through the punched holes. Electric signals then activate various other devices at the work stations, depending upon the circuit connections made in the transmitter. A printing machine, located at the work station where the credit checks are made, prints out information pertinent to the sales transaction. A punch card machine, located at the inventory record room, punches out an inventory card for the purchased merchandise. Information concerning item description, quantity, and price is transmitted to appropriate adding machines which keep running totals of item quantities and dollar sales volume, and this information can be visually displayed on a printed page.
The Nelson-Robinson apparatus discloses all the elements of the claims in suit except the central station and certain elements associated with the central station. In Wolf’s claim 2, for example, the Nelson-Robinson apparatus lacks elements (e), (f), and (h)(3). It also lacks elements (e), (f), (g), (h), (i)(3), and (j)(2) of Wolf’s claim 7.
United States Letters Patent No. 2,977,-048, entitled, “Automatic Calculator,” was filed by Ernest G. Andrews and Edward L. Vibbard on December 17, 1946 (the Andrews-Vibbard patent). It was classified by the PTO in class 235, subclass 162. This is the same class as the Wolf patent, but a different subclass. Andrews-Vibbard issued on March 28, 1961, but was never considered by the Patent Office during the prosecution of the claims in suit.
The Andrews-Vibbard described apparatus is an electrical computing device of some sophistication which has provisions for storing results of intermediate calculations and later accessing those results for use as inputs for further calculations. The input information is coded onto perforated paper tapes. The type of calculation to be performed by the machine, and the timing of this performance in relation to other calculations, is controlled by a separate coded perforated tape called the master control tape. This tape contains the operating commands which permitted the apparatus to perform its basic addition and subtraction operations in a way that enabled it to do multiplication and division calculations, and ultimately to arrive at solutions to ballistic equations.
The Andrews-Vibbard apparatus, though not primarily a data storage or memory device, nonetheless did perform a limited storage function during the course of its *1011 calculation procedure. Moreover, as disclosed, the apparatus is capable of storing information on a paper tape for selective accessing by a computing device. The selection process was accomplished by means of telephone line-switching hardware, which Andrews-Vibbard teaches was well-known to those skilled in the art of early information processing systems hardware design. The patent in suit relies on an identical data storage arrangement for its price information. In addition, the Andrews-Vibbard apparatus satisfies all of the central station requirements of the claims in suit. The following claim 2 elements can be found in Andrews-Vibbard: (e), (f), (h), and (i). The following claim 7 elements can be found in Andrews-Vibbard: (e), (f), (g), (h), (i), and (j).
The claims in suit make considerable use of means language which reads broadly on the devices disclosed in the prior art. The structural elements or devices disclosed in the Wolf specification that perform the functions defined in the means portions of the claims were each well-known in the prior art at the time of the Wolf invention,[6] as is amply demonstrated by Nelson-Robinson and Andrews-Vibbard. Thus, the patentability of the claims is not derived from the structural elements disclosed in the specification. The only difference between these references and the claims is that neither reference alone discloses the precise combination of elements claimed in the Wolf patent. Thus, the patentability of the claims must stem from the alleged fact that the specific combination of claim elements in Wolf was not disclosed in the prior art and the additional allegation that the specific combination of claim elements was nonobvious to one of ordinary skill in the art.
The appellants have argued that, not only would one of ordinary skill not know how to arrive at the claimed combination of elements, but that the appellee failed altogether to prove the level of ordinary skill in the art which pertains to the Wolf claims. This deficiency, it is said, makes it impossible to state one way or the other what one of ordinary skill in the art was capable of doing, or why in light of such skill such a person might have found the claimed invention lacking in nonobviousness.

Level of Skill in the Art

Some of the factors which have been considered in evaluating the level of ordi- ' nary skill in the art appear in the following excerpt from Jacobson Bros., Inc. v. United States, 512 F.2d 1065, 185 U.S.P.Q. 168 (Ct.Cl.1975):
[T]he various prior art approaches employed, the types of problems encountered in the art, the rapidity with which innovations are made, the sophistication of the technology involved, and the educational background of those actively working in the field are among the factors which will ofttimes aid in developing a picture of what is the level of skill of the ordinary person in an art. Considerations such as commercial success and the failure of others, characterized as “secondary” in Graham, are nonetheless invaluable as real-life indicia * * * of the level of skill in the art * * *.
The appellee’s proof on the issue of the level of skill in the art consists of the following: (1) The evidence adduced in support of its § 102 defenses (defenses the trial judge prohibited on procedural grounds); (2) the prior art patents; and (3) the testimony and educational qualifications of the witnesses who were working in the art of information processing systems hardware prior to May 26, 1958.
The evidence adduced in support of the § 102 defenses (the SAGE defense and the Air Force defense)[7] can be probative on the issue of the level of skill in the pertinent art even if it be considered inadequate to establish the existence of a § 102 defense (an *1012 issue we do not reach). There is no distinction in this regard between § 102(a) proofs, Simmonds Precision Prods., Inc. v. United States, 153 USPQ 465, 468 (Ct.Cl. Trial Div. 1967) (case settled by stipulation of judgment for plaintiff), and § 102(g) proofs, Int’l Glass Co. v. United States, 408 F.2d 395, 161 USPQ 116, 187 Ct.Cl. 376 (Ct.Cl.1969). Moreover, Jacobson, supra, leaves no doubt about the probativeness of prior art or the educational backgrounds of those working in the field.
In terms of the level of skill in the art at the time of the Wolf filing date, we accept the trial judge’s finding that the evidence demonstrated the following facts: — Those skilled in the art were able to coordinate specific input information with related stored data and then route this combined information based upon the original input information. It was within the level of skill in the art to conduct a system capable of performing calculations on the input information before associating it with the related stored data. It was also possible to have the calculations performed on the combined input information and stored data, and then route the calculation results in accordance with the initial input information. The level of skill had reached a point where all of the basic information transfer and manipulation techniques, e.g., accessing stored data from memory devices based on input information, and routing information based upon input information, were completely machine controllable. No human intervention was required in the systems which those skilled in the art of information processing hardware were capable of building at the time of the invention in suit. The advances being made in the level of skill in the art were primarily confined to improving the speed, reliability, and storage and handling capacities of the hardware. Electronic devices were replacing the electromechanical devices. The individuals working in the art were of above average intelligence and educational training. Many possessed advanced university degrees.

The Claims in Suit Lack Nonobviousness

The question of nonobviousness is a simple one to ask, but difficult to answer. The person of ordinary skill in the art at the time of the patentee’s invention, which in this case is May 26, 1958, is presumed to have before him all of the relevant prior art. As has been previously explained, the available art shows each of the elements of the claims in suit. Armed with this information, would it then be nonobvious to this person of ordinary skill in the art to coordinate these elements in the same manner as the claims in suit? The difficulty which attaches to all honest attempts to answer this question can be attributed to the strong temptation to rely on hindsight while undertaking this evaluation. It is wrong to use the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit. Monday morning quarterbacking is quite improper when resolving the question of nonobviousness in a court of law.
Mr. Bloch, the expert witness engaged by the appellee, testified that the claimed invention would be obvious to one of ordinary skill in the art at the time of Mr. Wolf’s invention date. The testimony of this witness on this point consisted of conclusions without supporting explanations. The trial judge considered that the lack of supporting explanations was an omission which detracted from the persuasiveness of the conclusions of Mr. Bloch. Nonetheless, the court below held that the testimony of this witness, when combined with other evidence, was sufficient to constitute a prima facie demonstration of obviousness pursuant to 35 U.S.C. § 103.
In rebuttal of this prima facie demonstration of obviousness, the appellants offered the testimony of Mr. Nikolai, a witness experienced on matters of patentability, though not a person of ordinary skill in the art of information processing systems hardware during the relevant time period. Mr. Nikolai testified that it would not be obvious to one of ordinary skill in the art to combine the Nelson-Robinson apparatus with the Andrews-Vibbard apparatus, both cited by the appellee, to achieve the result *1013 of the claims in suit. Building upon this point, appellants allude to the unlikelihood of a retail business using an apparatus like Andrews-Vibbard because of its enormous size, cost, and complexity in comparison to the needs of the retail businessman. However, Mr. Nikolai did not testify that it would not have been obvious to combine the elements found in the disclosures of Nelson-Robinson and Andrews-Vibbard and thereby arrive at the combination of elements recited in the claims in suit. There is a distinction between trying to physically combine the two separate apparatus disclosed in two prior art references on the one hand, and on the other hand trying to learn enough from the disclosures of the two references to render obvious the claims in suit. Mr. Nikolai’s testimony touched upon the former, but ignored the latter.
Claims may be obvious in view of a combination of references, even if the features of one reference cannot be substituted physically into the structure of the other reference. In re Andersen, 391 F.2d 953, 958, 157 USPQ 277, 281, 55 CCPA 1014 (Cust. & Pat.App.1968). What matters in the § 103 nonobviousness determination is whether a person of ordinary skill in the art, having all of the teachings of the references before him, is able to produce the structure defined by the claim. In re Twomey, 218 F.2d 593, 104 USPQ 273, 275, 42 Cust. & Pat.App. 742 (Cust. & Pat.App. 1955). The fact that features of one reference cannot be substituted into the structure of a second reference may indicate that the claims were nonobvious in view of the combined teachings of the two references. But this is not necessarily so, as Anderson, supra, makes clear. The same can be said regarding a complete mechanical misfit between two separate patented devices when the combination is alleged to demonstrate the obviousness of patent claims. But Mr. Nickolai’s testimony does not address these points. Rather, he raises only the point that it was not likely that the Andrews-Vibbard apparatus would be integrated into the Nelson-Robinson apparatus by one of ordinary skill in the art. This may be so for reasons of economic feasibili ty, but not for any want of technological feasibility. The combination of these two inventions does not make good economic sense, but there is no mismatch between their technologies.
In other words, the fact that the two disclosed apparatus would not be combined by businessmen for economic reasons is not the same as saying that it could not be done because skilled persons in the art felt that there was some technological incompatibility that prevented their combination. Only the latter fact is telling on the issue of nonobviousness.
The failure of appellants to show the existence of a long-felt need for the patented device amply explains why no businessman would undertake to literally combine the Nelson-Robinson and Andrews-Vibbard apparatus. However, this does not indicate any technological incompatibility between these two prior art defenses. Indeed, as the trial judge correctly found, it appears quité feasible both economically and technologically, to combine the several elements comprising the Nelson-Robinson and AndrewsVibbard devices to arrive at the claims in suit. Moreover, it appears that to do so would have been obvious to one of ordinary skill in the art at the time Wolf made his invention.
In sum, Judge Colaianni’s conclusion of obviousness, which we accept, rests on the testimony of Mr. Bloch regarding the disclosures of the Nelson-Robinson and Andrews-Vibbard patents, and the exhibits and testimony offered by the appellee in support of its prohibited § 102 defenses. Moreover, the inability of the appellants to effectively undermine the foregoing evidence or to present evidence on such factors as long-felt need, teaching away in the pri- or art, the failure of others, and commercial success, leaves the appellee’s prima facie case of obviousness unshaken.
II — Deposition Costs
This part of the opinion considers the deposition costs of appellants’ expert witness. Judge Colaianni found in his opin *1014 ion below that the cross-appellant had earlier offered to pay the reasonable and necessary expenses associated with such a deposition, and that the judge had previously determined (in his order of August 10,1979) the amount of money which defendant had previously obligated itself to pay; in the judge’s view, he had determined the dollar amount of the costs which the defendant voluntarily had offered to pay in order to secure permission to depose Mr. Nikolai. Since the cross-appellant continued to dispute $1,181.25 of the amount of the judge’s dollar determination, an amount which to this day remains unpaid, the judge thereafter concluded as a matter of law that the defendant’s offered payment was overdue. This order was reviewed by the Court of Claims in its order dated June 26,1981. In this order the court stated:
In preparing his ultimate report, the trial judge should then treat the costs issue (when there is one) in the same manner as all substantive legal issues in the case, i.e., he should make proposed findings of fact and conclusions of law on the cost issue.
In his opinion below, Judge Colaianni said: “Neither the parties nor I ever anticipated that this dispute as to the amount of the costs presented a triable issue. It began purely as a matter incidental to discovery. Both parties were silent on this matter in their posttrial briefs and proposed findings of fact. There is no evidence in the trial record upon which to base factual findings, nor, in view of the court’s June 26, 1981, order, are there any legal issues left to be resolved. My original determinations were based upon the statements of counsel and my own personal knowledge of the events. All of this information appears in my orders and the related motions of the parties. These orders are dated: January 24,1979; March 23,1979; August 10, 1979; April 24,1981; May 11,1981. Thus, I reaffirm the conclusion of my August 10, 1979, order as to the $1,181.25 amount which the defendant promised to pay to the plaintiffs as part of the reasonable and necessary costs of the deposition in question.”
We are satisfied that Judge Colaianni’s decision on this issue (together with his finding on the point) met the essential requirement of the Court of Claims order, supra, and, having thoroughly reviewed his orders and memoranda as well as the numerous related motions and responses by both parties, we accept his determination both as to the amount due and the circumstances giving rise to the determination of that particular amount. Our review of the record reveals a history of poor relations between these parties over matters pertaining to discovery, apparently having begun with appellants’ refusal to answer certain interrogatories by the Government. This refusal was confirmed by order of Judge Colaianni on December 22,1978, in which he stated that “[t]o require plaintiffs to answer these interrogatories would, in effect, be ordering plaintiffs to prepare defendant’s case for it. That is hardly within the purpose or scope of the discovery rules.”
The Government did not appeal that re-, fusal, but then sought, and was granted, the right to depose appellants’ expert witness Mr. Nikolai, claiming that this deposition was its only remaining avenue for gaining information it needed. Those deposition costs are here at issue as a result of the trial judge’s decision both that the Government had earlier agreed to pay reasonable and necessary expenses associated with this deposition and also that a portion of the deposition was used by the Government to “develop” its case. Those determinations are supported by the record and have not been shown by the cross-appellant to have been either erroneous in law or abuses of discretion. Cf. Fed.R.Civ.P. 26(c).
Ill — Conclusion
Appellants are entitled to collect $1,181.25 as part of the reasonable and necessary costs of the deposition of Mr. Nikolai. The claims in suit are invalid for obviousness per 35 U.S.C. § 103 (1976), and accordingly the petition was properly dismissed subject to the Government’s payment of $1,181.25 to appellants.

Affirmed.

 Pursuant to the order of this court dated October 4, 1982, the Claims Court thereafter issued a final judgment in accordance with Trial Judge Colaianni’s recommended decision of August 14, 1981. We treat both sides’ exceptions to that decision as an appeal and cross-appeal from that judgment. Appellants, plaintiffs in the Court of Claims, filed their exceptions first and we designate them appellants and crossappellees.

. The rearranged sequencing and the subparagraphing is superimposed on the claims of the patent solely for the purpose of facilitating discussions involving the claims. The superimposition permits a precise identification of the various claim elements. It is a more detailed location scheme than the column and line-number scheme which one finds in patents. The rearranged sequencing has no bearing on the patentability of these particular claims. The following shorthand will be used in this opinion: Claim 2(a)(1), or element 2(a)(1), shall refer to subparagraph (a)(1) of claim 2 of the Wolf patent, i.e., “An electrical system.”

. United States Letters Patent No. 2,977,048.

. United States Letters Patent No. 2,987,704.

. Trial transcript, pp. 87-88.

. Mr. Nikolai testified: “My experience at Uni-vac in the early days involved exposure to digital computer hardware, digital communication hardware.”

. The appellants conceded this fact below.

. SAGE is an acronym for the Semi-Automatic Ground Environment air defense system. The other air force system mentioned is the Air Force’s early AUTODIN system defense. These are both adverted to in more detail in the findings below.