**ZENITH CONTROLS, INC., Plaintiff and Counterdefendant,**

**v.**

**AUTOMATIC SWITCH COMPANY, Defendant and Counterplaintiff.**

No. 84 C 9477.

United States District Court, N.D. Illinois, E.D.

Dec. 5, 1986.

Lawrence R. Levin, Wilson P. Funkhouser, Jonathan Vegosen, Deborah G. Moore, Kenneth A. Grady, Levin & Funkhouser, Ltd.; William T. Rifkin, McDougall, Hersh & Scott, Chicago, Ill., for plaintiff and counterdefendant.

Norman Lettvin, Chicago, Ill., Alan H. Levine, Fiddler & Levine, New York, N.Y., for defendant and counterplaintiff.

## MEMORANDUM OPINION AND ORDER

BRIAN BARNETT DUFF, District Judge.

Plaintiff Zenith Controls, Inc. ("Zenith") seeks a declaratory judgment that U.S. Patent No. 4,157,461 ("the '461 patent"), owned by defendant Automatic Switch Company ("ASCO"), is invalid and unenforceable and is not infringed by the manufacture, use, and sale of certain Zenith products. Zenith also accuses ASCO of violating § 2 of the Sherman Act, 15 U.S.C. § 2, by attempting to enforce a patent which it knows to be invalid and unenforceable. ASCO counterclaims for patent infringement. The case comes before the court on Zenith's motion for partial summary judgment as to the unenforceability and invalidity of the '461 patent.[1]

## I. BACKGROUND

ASCO's '461 patent, issued in 1979 to Dominick Wiktor, covers an arrangement of electrical switches for use in industrial and commercial power distribution systems. The patent's design incorporates the functions of three kinds of previously known switches: automatic transfer switches, bypass switches, and isolation switches.

An automatic transfer switch ("ATS") ensures an uninterrupted supply of power to a particular user or "load" by sensing a failure of the normal power source and automatically switching the load to a backup power source, such as an emergency generator. A bypass switch ("BPS") routes current around a segment of an electrical circuit so that although the bypassed portion remains in the circuit, its presence is no longer essential. In this sense a BPS resembles a bypass around a portion of a highway; the bypass permits traffic to move toward its destination along either of two routes, enabling workers to close the main road for repairs without cutting off the flow of traffic.

An isolation switch ("IS") disconnects a component from a circuit and thus prevents current from reaching it—much as erecting a roadblock on a main road forces traffic onto a bypass and isolates the main road for repairs. In their most rudimentary form, isolation switches are simply plugs connecting one part of an electric circuit to another, such as the plugs that connect household appliances to wall sockets, or the jacks that connect headphones to stereo receivers. Light switches and circuit breakers are slightly more complicated types of isolation switches.

Automatic transfer switches, bypass switches, and isolation switches long have been used in combination. For many

---

1. One other motion also is pending: ASCO's "Request that Claim 11 of the patent in suit be considered in its corrected form." The court will address this motion in its discussion of Zenith's motion for partial summary judgment.

years, workers servicing or replacing an ATS first bypassed it with a BPS so that its isolation would not disrupt the flow of electricity to the load, then isolated or removed it from the circuit with an IS to allow handling of the ATS without risk of electrical shock.

Although an arrangement consisting of an ATS, a BPS, and an IS permitted isolation and servicing of the ATS, it also posed two sorts of risks. First, if a worker failed to follow the proper sequence in disconnecting the ATS and attempted to isolate it from the circuit before bypassing it, he would cut off the flow of electricity to the load. Moreover, because the isolation contacts used to disconnect automatic transfer switches ordinarily are not designed to break high voltage circuits, disconnecting an ATS without first bypassing it could cause arcing that would endanger workers and equipment.

Second, in bypassing the ATS a worker might mistakenly connect the load to a source of power other than the power source to which the ATS then connected the load. If, for example, the ATS connected the load to an emergency power supply because the commercial power system had failed, a worker who bypassed the ATS by connecting the load to the failed commercial system, then disconnected the ATS, would cut off power to the load and risk arcing as he separated the ATS from the circuit. Alternatively, if the load were connected to the commercial power supply through the ATS and a worker bypassed the ATS by connecting the load directly to the emergency source, then for at least an instant the load would be connected simultaneously to both sources. The excessive voltage could cause an explosion injuring bystanders and damaging the system's components.

In order to minimize these dangers, manufacturers of ATS, BPS, and IS arrangements developed "sequencing interlocks" to prevent workers from isolating automatic transfer switches before bypassing them, and "wrong source interlocks" to prevent workers from bypassing automatic transfer switches to a wrong source. Like the use in combination of automatic transfer switches, bypass switches, and isolation switches, the use of sequencing interlocks and wrong source interlocks with such switch arrangements was known before Wiktor applied for the '461 patent.

In addition to allowing the dangers ultimately eliminated by the use of sequencing and wrong source interlocks, the ATS–BPS–IS combination had another drawback: the three switches were separate components which had to be interconnected by cables. This required considerable floor and wall space and involved numerous moving parts associated with each set of switch contacts. The cables themselves were expensive and required maintenance. Moreover, each cable connection generated heat.

Wiktor partially solved these problems in the early 1970s by inventing a combined bypass and isolation switch ("BPIS") eliminating the need for cables between the BPS and IS and reducing the number of moving parts. Wiktor received U.S. Patent No. 3,697,709 ("the '709 patent") for this invention in 1972, and soon afterwards ASCO began marketing its Series 932 BPIS under protection of that patent. ASCO's Series 932 bypass isolation switches included both wrong source interlocks and sequencing interlocks, and were sold as accessories to automatic transfer switches. Because the Series 932 BPIS did not incorporate an ATS, however, it remained necessary to connect the ATS and BPIS with cables.

The '461 patent improves on this arrangement by placing an ATS and a BPS in a single housing in such a way that the ATS moves bodily toward and away from the BPS upon operation of a lever. The two switches carry cooperable contacts which plug into one another when the two switches are together, much as an electrical plug slides into a wall socket, and separate when the lever pushes the ATS away. This arrangement eliminates the need for connecting cables and shrinks the amount of space required for the switch assembly. Additionally, because operating the lever to

push the ATS away from the BPS isolates the ATS from the circuit, there is no need for a separate IS or for the pivoting isolation contacts present in a BPIS. As a result, the '461 design requires fewer moving parts than previous switch arrangements. A sequencing interlock prevents disconnection of the ATS before it has been bypassed, and a wrong source interlock prevents bypassing the ATS to the wrong source.

Zenith challenges the '461 patent on two grounds. First, it argues that the entire patent is unenforceable as a matter of law because ASCO engaged in inequitable conduct before the Patent and Trademark Office ("PTO") in procuring Claim 11 of the patent. Zenith alleges that ASCO concealed from the PTO the fact that ASCO's Series 932 BPIS contained each of the three elements of Claim 11. Second, Zenith argues that Claims 1, 2, 8, 9, 11, and 14 of the patent are invalid for obviousness. Because Zenith's allegation of inequitable conduct challenges the entire patent, the court turns to that allegation first.

## II. INEQUITABLE CONDUCT

Zenith alleges that the entire '461 patent is unenforceable because ASCO engaged in inequitable conduct before the PTO by failing to disclose that its prior art Series 932 BPIS, when used as intended with an ATS, combined all three elements of Claim 11 of the '461 patent.

The ex parte nature of the patent application process requires "[t]he highest standards of honesty and candor on the part of applicants in presenting" the relevant facts to the PTO, *Norton v. Curtiss*, 433 F.2d 779, 794 (CCPA 1970), and it is settled law that an applicant's failure to adhere to these standards with respect to even a single claim renders an entire patent unenforceable, *J.P. Stevens & Co. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1561 (Fed.Cir. 1984). The party challenging the patent must establish by clear and convincing evidence at least "a threshold degree of materiality of the undisclosed or false information," *id.* at 1559, and "a threshold intent".

The test for materiality is whether there is a substantial likelihood that a reasonable patent examiner would have considered the false or nondisclosed information important in deciding whether to allow the application to issue as a patent; intent need not be shown by direct evidence of deliberate scheming but may be inferred from gross negligence. *Id.* at 1560–62. Once the challenger makes these threshold showings of materiality and intent, "the court must balance them and determine as a matter of law whether the scales tilt to a conclusion that inequitable conduct occurred." *Id.* Accord, *In Re Jerabek*, 789 F.2d 886, 229 U.S.P.Q. 530, 532–33 (Fed.Cir.1986).

The information material to the issuance of Claim 11, and thus the information ASCO was required to disclose to the PTO, naturally depends on the contents of ASCO's application claim. Because the parties disagree about what the court should consider to be the elements of Claim 11, however, the court must resolve this dispute before turning to the merits of Zenith's allegation of inequitable conduct.

A. *Request for Consideration of Claim 11 in "Corrected" Form*

As issued by the PTO, Claim 11 of the '461 patent reads as follows:

11. An automatic transfer and bypass switch arrangement comprising:

(a) an automatic transfer switch which can be switched between one condition for connecting a normal source of power to a load and an alternative condition for connecting an emergency source of power to the load,

(b) a bypass switch having three alternative conditions, the bypass switch in one condition connecting the normal source of power to the load, in a second condition connecting the emergency source of power to the load, and in a third condition connecting neither source of power to the load, and

(e) means for preventing switching of the bypass switch to a condition in which it connects the load to a source

other than the source being connected to the load by the transfer switch.

ASCO asserts that Claim 11 reads as it does only because of its attorney's error in redrafting a portion of the patent application, and that but for this mischance Claim 11 would be narrower because of the inclusion of omitted elements (c) and (d) as follows:

(c) mutually cooperable contacts for electrically connecting the two switches when the cooperable contacts are engaged with one another, and

(d) means for moving the entire automatic transfer switch in two opposite directions to disengage and engage, respectively, the cooperable contacts.

ASCO's attorney avers having discovered this omission nearly ten months after completion of briefing on Zenith's motion for partial summary judgment—briefing which, it is worth noting, included extensive discussions by both parties of Zenith's allegation of inequitable conduct regarding Claim 11. Counsel reacted to his realization by filing two documents simultaneously: with the PTO, a request for issuance of a certificate of correction under 35 U.S.C. § 255 amending Claim 11 to include elements (c) and (d); and with this court, a "Request that Claim 11 of the Patent in Suit be Considered in its Corrected Form." The PTO has yet to rule on ASCO's request for a certificate of correction.

■ The court rejects ASCO's request for consideration of Claim 11 in a "corrected" form for two reasons. First, paragraph 59 of Zenith's statement of undisputed material facts, submitted pursuant to Local Rule 12(e), states that "Claim 11 of the Wiktor '461 patent calls for: . . .," and then recites the text of Claim 11 as issued by the PTO. ASCO failed to object to paragraph 59, and under Local Rule 12(f) the contents of paragraph 59 therefore are deemed admitted. ASCO had an obligation to inquire into the accuracy of paragraph 59 before responding to Zenith's 12(e)

statement, and it did not meet that responsibility. There is no exception to Local Rule 12(f) where an attorney, as here, pleads grounds for objecting to a statement of undisputed material fact long after the deadline for objecting is past. While the rule may seem harsh in this respect, it is necessary for the orderly disposition of summary judgment motions.

Second, and more fundamentally, ASCO's request must be rejected because what is in dispute is the '461 patent as issued by the PTO. While Congress has given the Commissioner of Patents and Trademarks authority to alter the contents of existing patents through a variety of different procedures, see, e.g., 35 U.S.C. §§ 251, 253–56, 301–07, it has never provided that patent owners seeking changes in their patents may obtain them directly from the courts. Lacking the power to amend Claim 11, the court must consider it as issued by the PTO.

### B. Inequitable Conduct Arising From Failure to Disclose Material Prior Art

#### 1. Withholding of Material Information

■ Zenith's principal argument in support of its allegation of inequitable conduct is that ASCO's patent application, which in its amended form sought the issuance of Claim 11 precisely as approved by the PTO, failed to disclose that when ASCO's Series 932 BPIS was used as intended with an ATS it combined all three elements of Claim 11: namely, an ATS, a BPS, and a wrong source interlock. Although ASCO's application did cite the '709 patent, which underlay the Series 932 switches and discloses the combination of an ATS and a BPIS,[2] Zenith argues that the '709 patent does not disclose the combination of these two elements with a wrong source interlock. Only ASCO's marketing materials for the Series 932 switches disclose a

---

**2.** The parties' briefs implicitly assume that the BPIS disclosed in the '709 patent is sufficient to teach a BPS in similar contexts in the '461

patent. This assumption is correct because the BPIS incorporates a BPS.

wrong source interlock in combination with an ATS and a BPIS, Zenith asserts, and because ASCO did not provide the PTO with these marketing materials it concealed the fact that prior art had combined all three elements of Claim 11.[3]

ASCO responds by pointing to the introductory portion of its patent application, entitled "Background of Invention", which it claims discloses the prior use of a wrong source interlock with an ATS and BPS. The relevant passage reads:

> While systems of the type described above operate satisfactorily, they involve three separate switch devices (automatic transfer switch, bypass switch, and isolation switch), a considerable number of cable connections as well as long cable runs, and complicated *safety interlocking schemes to prevent mishaps such as* inadvertant disconnection of the load from a power source or *connection of the load to both power sources at the same time.* The complication and expense can be reduced by using a combination bypass and isolation switch as shown and described in U.S. Pat. No. 3,697,709.

(Emphasis added).

Although ASCO asserts that the underlined portion of this passage adequately informed the PTO of the prior combination of wrong source interlocks with automatic transfer switches and bypass switches, its claim is flawed for two reasons. First, the passage only discloses the combination of an ATS and wrong source interlock with a BPS; it does not reveal the combination of an ATS and wrong source interlock with either a BPIS or a device, like a BPS equipped with cooperable contacts, that performs the functions of separate bypass and isolation switches. Rather, it speaks of bypass and isolation switches as separate devices and therefore only discloses the presence of a wrong source interlock in the traditional ATS–BPS–IS arrangement.

Second, even if the passage does suggest the combination in prior art of all three elements of Claim 11, that suggestion comes in the form of a passing mention in an introductory paragraph—not in the form of a reference to specific prior art likely to catch the eye of a busy patent examiner. Because knowledge that the prior art combined all three elements of Claim 11 would have been material to the PTO's decision on whether to issue that claim, Zenith has shown that ASCO failed to inform the PTO of prior art material to its patent application.

#### 2. *Threshold Showing of Intent*

■ Regardless of whether ASCO's patent application failed to disclose material prior art, Zenith is entitled to summary judgment on the basis of inequitable conduct only if it also can show by undisputed facts that in omitting the information ASCO acted with "a threshold intent," *J.P. Stevens & Co. v. Lex Tex Ltd., Inc.,* 747 F.2d at 1560.

> That intent need not be proven with direct evidence. It may be proven by showing acts the natural consequences of which are presumably intended by the actor. Proof of deliberate scheming is not needed; gross negligence is sufficient. Gross negligence is present when the actor, judged as a reasonable person in his position, should have known of the materiality of a withheld reference. On the other hand, simple negligence, oversight, or an erroneous judgment made in good faith, is insufficient.

*Id.* (citations omitted).

Whether this court finds that ASCO acted with "a threshold intent" in large part depends on whether it believes the explanation ASCO's counsel offers for the absence of elements (c) and (d) from Claim 11. ASCO's counsel states by affidavit that he

---

**3.** In a letter dated September, 1975 promoting ASCO's Series 932 bypass isolation switches, an ASCO sales manager wrote:

> ASCO 932s provide many unique features. For example, the load can be easily bypassed.

Interlocking prevents bypassing to an improper source, and also prevents isolating the transfer switch until *after* the load is bypassed....

(Emphasis in original).

inadvertently omitted elements (c) and (d) from what became Claim 11 as he prepared an amendment to ASCO's original patent application.

Counsel's explanation of the omission is as follows: The original patent application contained 16 claims, claims 2–16 of which were dependent on Claim 1, and Claim 6 of which ultimately became Claim 11 of the patent. In an Official Action in response to the original application, the PTO indicated Claims 3–8 would be "[a]llowable if rewritten to include limitations of previous claims." ASCO's counsel then prepared an amendment to the application in which he rewrote original Claims 1 and 6 as independent Claim 17, explaining in Paragraph 4 of the amendment that:

> Claim 6 has been rewritten in independent form as claim 17 therefore this claim is also allowable. By adding the subject matter of claim 6 to claim 1 in order to form claim 17, it is believed that the claim possesses sufficient structure.

The PTO allowed independent claim 17, which after renumbering became Claim 11 of the patent.

Although counsel intended application claim 17 to combine all elements of original Claims 1 and 6, as Paragraph 4 suggests, he inadvertently omitted elements (c) and (d) from the text of the new claim in preparing the amendment. He continued to act on the assumption that Claim 17 contained elements (a)–(e), and if the PTO ever noticed the omission of elements (c) and (d), it never called that error to his attention. Counsel discovered the omission only while reviewing his files after completion of briefing on Zenith's motion for partial summary judgment.

■ This version of events suggests that ASCO's counsel may have been negligent in preparing the amendment, but not that he was grossly negligent or acted deliberately. If the court accepts the assurances of ASCO's counsel that he was unaware elements (c) and (d) were missing from the application claim that matured into Claim 11, and acted with a good faith belief that those elements were present, then he was not grossly negligent in failing to apprise the PTO that ASCO's Series 932 BPIS combined elements (a), (b), and (e) of the application claim. The patentabilty of an invention depends on the novelty and nonobviousness of the combination of *all* its elements, and the mere fact that *some* of them previously have been combined does not bar issuance of a valid patent.

■ The Claim 11 ASCO's counsel thought he applied for included five elements: an ATS, a BPS, mutually cooperable contacts for connecting the two switches, a means for moving the ATS to engage and disengage those contacts, and a wrong source interlock. ASCO disclosed the '709 patent, which taught the combination of an ATS and a BPIS. Should it also have disclosed that its Series 932 BPIS added a wrong source interlock to the elements of the '709 patent? Probably so, but the Claim 11 imagined by ASCO's counsel included two other elements as well, neither of which was present in the '709 patent or the Series 932 BPIS. Because ASCO does not assert the patentability of any one of the five elements of Claim 11, or even of the combination of any subset of those five elements, the significance to the PTO of the omitted information regarding the Series 932 switch and its wrong source interlock would have been marginal had the patent application read as ASCO's counsel says he assumed it did.

In sum, if the trier of fact finds that ASCO's counsel inadvertently and without gross negligence omitted elements (c) and (d) from the application claim that became Claim 11 of the patent, then it cannot find that ASCO, acting either deliberately or with gross negligence, withheld material information from the PTO. On the other hand, if the trier of fact finds that the omission of elements (c) and (d) was not accidental, then ASCO committed inquitable conduct by failing to disclose that its Series 932 BPIS, when used as intended with an ATS, combined all three elements of Claim 11.

The credibility of ASCO's history of Claim 11 is not an issue that the court can resolve on a motion for summary judgment. Judges have emphasized repeatedly that the dry pages of a court file ordinarily are insufficient to resolve questions of good faith, motive, and intent. *See, e.g., White Motor Co. v. United States*, 372 U.S. 253, 259, 83 S.Ct. 696, 699, 9 L.Ed.2d 738 (1963); *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, No. 85–2372, slip op. at 2 (7th Cir. Aug. 20, 1986); *Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 185 (9th Cir.1976). An exception to this principle is inappropriate here, and Zenith therefore is not entitled to partial summary judgment on the basis of inequitable conduct.

## III. OBVIOUSNESS

■ Zenith contends that Claims 1, 2, 8, 9, 11, and 14 of the '461 patent are invalid under 35 U.S.C. § 103, which provides that an invention may not be patented

> if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Obviousness under § 103 is a question of law whose resolution turns principally on three basic factual determinations: the scope and content of the prior art, the level of ordinary skill in the art, and the differences between the prior art and the claims at issue.[4] *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). In addition, the court must take into account "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc." *Id.*

■ The court must consider each independent claim in its entirety, *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed.Cir.1983), and must presume the patent valid until the challeng-

er proves otherwise by clear and convincing evidence, 35 U.S.C. § 282; *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 894 (Fed.Cir.1984). In order to render a claimed invention obvious, the evidence need not show that prior art actually combined all elements of the invention, or even that it is possible to combine without modification the features of one prior art reference with those of others. *Orthopedic Equipment Co., Inc. v. United States*, 702 F.2d 1005, 1013 (Fed.Cir.1983). Rather, it is enough that prior art suggests the claimed combination to one with ordinary skill in the art—a person who, by definition, "is presumed to have the 'ability to select and utilize knowledge from other arts reasonably pertinent to [the] particular problem' to which the claimed invention is directed." *Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1025 (Fed. Cir.1985).

### A. *Claim 1*

Claim 1 of the '461 patent reads as follows:

1. An automatic transfer and bypass switch arrangement comprising:

(a) an automatic transfer switch,

(b) a bypass switch having an open condition and at least one closed condition,

(c) mutually cooperable contacts for electrically connecting the two switches when the cooperable contacts are engaged with one another,

(d) means for moving the entire automatic transfer switch in two opposite directions to disengage and engage, respectively, the cooperable contacts, whereby the automatic transfer switch may be electrically disconnected from the bypass switch solely by the act of moving the transfer switch away from the bypass switch, and

(e) means for rendering said moving means ineffective to move the auto-

---

**4.** The parties agree that there is no genuine issue of material fact regarding the level of ordinary skill in the art.

matic transfer switch in a direction to disengage the cooperable contacts any time the bypass switch is in its open condition.

ASCO's original application for Claim 1 consisted only of elements (a)–(d). The PTO rejected application claim 1 as unpatentable in light of the '709 patent and U.S. Patent No. 4,051,335 ("the Ericson patent"), which discloses a draw-out apparatus for moving a circuit breaker equipped with mutually cooperable contacts toward and away from a switch panel.

Because the '709 patent taught the combination of an ATS with a BPS, and the Ericson patent taught the use of cooperable contacts with moving mechanisms for connecting and disconnecting switch elements, the Examiner found that "[n]o invention [is] seen in modifying [the '709 patent's] isolation switch 16 to have [an] electrical connector interface as suggested by [the Ericson patent] noting contacts 134, 136. [It is] [w]ithin [the] ordinary skill of [an] artisan to provide [a] disconnect interface between switches to allow for testing [and] maintenance." In short, the Examiner found the combination of elements (a)–(d) unpatentable because the prior art had combined elements (a) and (b) and elements (c) and (d), and because the combination of those two combinations should have been obvious to a person with ordinary skill in the art.

Rather than contest the Examiner's conclusion that the combination of elements (a)–(d) was unpatentable, as it could have done under 35 U.S.C. § 134, ASCO amended its application to add element (e)—a sequencing interlock. The PTO then issued Claim 1 in its amended form.

Zenith now argues that the PTO erred in issuing Claim 1, and that like the combination of elements (a)–(d), the combination of elements (a)–(e) was obvious to a person with ordinary skill in the art. Zenith rests its argument on evidence that prior art combined elements (a), (b), and (e), and also elements (c), (d), and (e). Because the combination of elements (a), (b), and (c), (d) was obvious, Zenith reasons, it follows that the

combination of elements (a), (b), (e) and (c), (d), (e) also was obvious.

It is undisputed that sequencing interlocks were used in combination with automatic transfer switches and bypass switches prior to the '461 patent, and thus that the prior art combined elements (a), (b), and (e) of Claim 1. Likewise, there is no dispute that prior to the '461 patent sequencing interlocks were used in combination with cooperable contacts and means for moving switches to engage and disengage those contacts. Two separate prior art patents, U.S. Patents No. 1,768,535 ("the Ainsworth patent") and 2,149,898 ("the Bellm patent"), teach the use of sequencing interlocks to prevent disengagement of switch elements carrying cooperable contacts, thus combining elements (c), (d), and (e) of Claim 1.

ASCO offers two lines of defense to Zenith's attack on the validity of Claim 1. First, it argues that the PTO's rejection of its original claim does not estop it from asserting the originality of that claim here, and that by amending application claim 1 to add element (e) it merely made an already patentable claim even stronger. Second, it argues that even if the PTO correctly found the combination of elements (a)–(d) unpatentable, the addition of element (e) rendered Claim 1 nonobvious because the prior art did not suggest the combination of a sequencing interlock with an ATS that plugs into a BPS. The court considers these arguments in turn.

### 1. *Effect of PTO Rejection*

▪ Both the Supreme Court and the Seventh Circuit have held that when the PTO rejects an application claim, and the applicant responds by submitting a narrower claim which subsequently issues as part of a patent, the patent holder may not reassert the patentability of the rejected subject matter during litigation concerning the obviousness of the amended claim. *Graham v. John Deere Co.*, 383 U.S. at 32–34, 86 S.Ct. at 701–02 (when PTO rejected original application claims as unpatentable in light of prior art and issued patent

only after amendment that relied on single feature of original claim, patent holder could not reassert validity of original claim in attempting to rebut obviousness challenge); *Burland v. Trippe Manufacturing Co.*, 543 F.2d 588, 591–93 (7th Cir.1976) (*Graham* estops patent holder from asserting nonobviousness of subject matter rejected by PTO as unpatentable). Only a single court has taken a contrary position since *Graham, see Ingersoll-Rand Co. v. Brunner & Lay, Inc.*, 474 F.2d 491, 498 (5th Cir.1973), *cert. denied* 414 U.S. 865, 94 S.Ct. 125, 38 L.Ed. 117, and as the Seventh Circuit noted in *Burland,* that court "neither referred to nor followed the Supreme Court's decision," 543 F.2d at 592.

*Graham* and *Burland* control the result here and preclude ASCO from arguing that elements (a)–(d) of Claim 1, standing alone, are nonobvious. Consequently, the sole basis for the patentability of Claim 1 is the addition of element (e) to the combination of elements (a)–(d).

2. *Sufficiency of Element (e)*

■ ASCO contends that even if the prior art combined a sequencing interlock with an ATS and BPS, and with cooperable contacts and a means for moving a switch; and even if the combination of an ATS, BPS, cooperable contacts, and moving means was obvious, the addition of a sequencing interlock to that combination rendered it patentable because the invention, for the first time ever, combined a sequencing interlock with an ATS that plugs into a BPS. ASCO argues that the Ericson, Ainsworth, and Bellm patents do not render this combination obvious in light of the '709 patent because of important differences between those patents and the subject matter of Claim 1 of the '461 patent.

ASCO maintains that the Ericson patent is irrelevant because it discloses a plug-in circuit breaker switch, which always is in either an open or a closed condition, used in combination with a sequencing interlock designed to prevent the switch from being unplugged while in the closed condition. By contrast, ASCO observes, the ATS dis-

closed in the '461 patent is always closed on one of two power sources, and the function of the sequencing interlock is to ensure that the BPS is closed before the ATS is unplugged from the BPS.

ASCO finds the Ainsworth patent inapposite for three reasons. First, it discloses the use of a sequencing interlock with a switch that, like the switch in the Ericson patent, is always either open or closed, while the '461 patent teaches the use of a sequencing interlock with a switch that is always closed. Second, the Ainsworth patent discloses an interlock mechanism in which the condition of a single switch determines whether that switch can be unplugged from the circuit, while the '461 patent discloses an interlock arrangement in which the condition of one switch determines whether a second switch can be unplugged from the first. Third, it differs from the '461 patent in disclosing the use of an interlock to prevent separation of a switch from fixed contacts, rather than to prevent separation of two switches.

Finally, ASCO asserts that the Bellm patent does not render Claim 1 obvious because, like the Ainsworth patent, it discloses a sequencing interlock in combination with a switch that is always either open or closed, rather than always closed, and because it discloses a sequencing interlock in combination with a plug-in switch capable of bypassing a portion of a circuit, thus suggesting a plug-in BPS rather than the plug-in ATS disclosed in the '461 design.

This list of differences is long but inconsequential. The court turns first to the Ericson patent. The PTO concluded that the combination of elements (a)–(d) was obvious when the '709 patent was viewed in light of the Ericson patent. This precludes ASCO's inconsistent argument that the Ericson patent is immaterial because it employs an open-or-closed switch rather than an always-closed ATS. The Examiner could not have found that the '709 and Ericson patents suggested the combination of an ATS, BPS, cooperable contacts, and moving means without also finding that the

Ericson patent's use of a circuit breaker, rather than an ATS, was irrelevant to its teachings about the potential for modifying the '709 design to include cooperable contacts and a moving means. As the court noted above, ASCO is estopped from challenging the PTO's rejection of that combination.

ASCO's assault on the materiality of the Ainsworth and Bellm patents also fails. Although the sequencing interlock mechanisms disclosed in those patents differ somewhat from the mechanism used in the '461 patent, the purpose of all three interlocks is precisely the same: to prevent electrical arcing when an electrical switch is unplugged from a circuit. Because the broad language of element (e) of Claim 1 makes no attempt to protect any particular means for preventing movement, the differences in design between the '461 interlock and the Ainsworth and Bellm interlocks are irrelevant.

In this context it simply does not matter that the Ainsworth patent's sequencing interlock operates based on the condition of the switch that is to be unplugged, and that it prevents the separation of a single switch from fixed contacts, nor does it matter that the Bellm patent's sequencing interlock prevents improper disconnection of a plug-in BPS. Finally, the fact that the Ainsworth and Bellm patents disclose sequencing interlocks in combination with open-or-closed switches rather than automatic transfer switches does not aid ASCO, since the '709 patent teaches the use of a sequencing interlock to prevent arcing upon the disconnection of an ATS from a circuit.

### 3. *Summary of Claim 1*

As the court noted above, Zenith need not prove that the prior art combined each and every element of Claim 1 without any need for modification. *See Orthopedic Equipment Co., Inc. v. United States,* 702

.F.2d at 1013. Rather, it need only prove that the combination of elements (a)–(e) would have been obvious to a person with ordinary skill in the art. 35 U.S.C. § 103. The court finds that the undisputed facts regarding the scope and content of the prior art, and the differences between the prior art and Claim 1 of the '461 patent, establish clearly and convincingly that the invention described in Claim 1 would have been obvious to a person with ordinary skill in the art and therefore is unpatentable.[5]

### B. *Claims 2, 8, and 9*

■ Claims 2, 8, and 9 are dependent on Claim 1, and ASCO raises no defense of their patentability that it did not also raise in defense of Claim 1. The court's conclusion that Claim 1 is unpatentable for obviousness therefore controls the disposition of Zenith's motion for a partial summary judgment of obviousness with respect to Claims 2, 8, and 9.

### C. *Claim 11*

■ It is undisputed that ASCO's Series 932 BPIS, when used as intended with an ATS, combined all three elements of Claim 11: an ATS, a BPS, and a wrong source interlock. Claim 11 therefore is unpatentable for obviousness.

### D. *Claim 14*

■ Claim 14 consists of elements (a)–(d) identical to elements (a)–(d) in Claim 1, and element (e) as follows:

(e) at least three pairs of mutually cooperable contacts for connecting the transfer switch to a normal source of power, to an emergency source of power, and to a load, respectively, the pairs of contacts being arranged so that when the transfer switch is moved from a position in which the cooperable contacts are disengaged toward a position of engagement the two pairs of contacts for connecting the transfer switch to the

---

5. Neither party has offered significant evidence concerning the "secondary considerations" that the Court found relevant to patentability in *Graham,* and this court finds no discussion of that evidence necessary in light of Zenith's strong showing of unpatentability on the basis of the three principal *Graham* factors.

sources of power engage before the pair of contacts for connecting the transfer switch to the load.

Element (e) describes an arrangement of the cooperable contacts connecting the ATS and BPS which permits workers to partially unplug the ATS from the BPS so that the ATS is connected to the two power sources but not the load. When the ATS is in this position, the workers may test its switching mechanism without risking disruption of power to the load.

The '461 design creates this test position by incorporating cooperable contacts of different lengths. The plug contact pairs connecting the two power sources to the ATS are longer than the plug contact pair connecting the load to the ATS. As a result, when the ATS is moved away from the BPS, the short contacts connecting the ATS and the load separate first, leaving the ATS connected to both power supplies but not to the load.

Zenith argues that Claim 14 is invalid because U.S. Patent No. 1,804,590 ("the Brown patent") teaches sequential engagement of cooperable contacts with moveable switch elements, and because the combination of that invention with elements (a)–(d) is obvious.

The Brown patent discloses a circuit breaker mounted on a truck and equipped with cooperable contacts that, with one exception, plug into another switch element. The remaining contact is longer than the others and forms a ground connection for the circuit breaker. As the circuit breaker is withdrawn from the switch element, the ground contact remains connected until the shorter contacts connecting the circuit breaker and switch element have completely separated. This ensures that the circuit breaker remains grounded during disengagement and thus eliminates the danger that arcing between the contacts on the circuit breaker and switch element will injure workers removing the circuit breaker.

Although the Brown patent does teach sequential engagement of cooperable contacts in moveable switch mechanisms, it does not disclose a "test position" such as that described in Claim 14, in which the sequential engagement of cooperable contacts permits workers to test a switch while isolated from the load but still connected to the power sources. Rather, it merely discloses a method for permitting the safe disengagement of switch mechanisms connected by cooperable contacts.

The test position of the '461 patent is not obvious in view of the Brown patent because the two designs employ sequentially engaging cooperable contacts for different purposes and in different contexts. The sole purpose of the Brown patent is to ensure safety as workers interrupt power to a moveable switch mechanism, while the purpose of the '461 patent's test position is to ensure the continuity of power to a moveable switch mechanism as it is disconnected from a load for testing, thereby simplifying the task of testing a moveable switch. Although the '461 design does maintain safety while serving these other purposes. It does so through the use of a BPS and sequencing interlock, not through the use of sequentially engaging cooperable contacts. The only common ground between the Brown and '461 patents is that both employ sequentially engaging cooperable contacts, but an invention is not obvious simply because it incorporates a previously known idea, *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546 (Fed.Cir.1984).

By teaching the sequential engagement of cooperable contacts, the Brown patent may disclose the mechanism that Wiktor used to create the test position in the '461 patent, but it neither discloses nor suggests the creation of the test position itself, let alone its use in combination with an ATS and BPS. The Brown patent thus is too remote from the invention described in Claim 14 to provide clear and convincing evidence of its obviousness. In the absence of stronger evidence, which Zenith does not supply, the motion for partial summary judgment as to the obviousness of Claim 14 fails.

## IV. CONCLUSION

Zenith's motion for partial summary judgment is denied insofar as Zenith alleges that the '461 patent is unenforceable for inequitable conduct. Insofar as Zenith alleges that portions of the '461 patent are invalid for obviousness, the motion is granted as to Claims 1, 2, 8, 9, and 11, but denied as to Claim 14.

IT IS SO ORDERED.