474

**WESTEK ASSOCIATES, a California partnership, Plaintiff,**

v.

**TRI–LITE ELECTRONICS, INC., an Illinois corporation, and Bright Image, Inc., an Illinois corporation, Defendants.**

No. 85 C 10591.

United States District Court, N.D. Illinois, E.D.

Sept. 25, 1989.

Joseph N. Hosteny and Kathleen A. Lyons, Niro, Scavone, Haller & Niro, Ltd., Chicago, Ill., and Bernard Wheeler–Medley, Brown, Martin, Haller & Meador, San Diego, Cal., for plaintiff.

Robert E. Wagner, Alan R. Barry and Thomas K. Stine, Wallenstein, Wagner, Hattis, & Strampel, Ltd., Chicago, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRIAN BARNETT DUFF, District Judge.

Based on the pleadings filed in this case, the exhibits in evidence, the testimony of witnesses, the briefs and memoranda of counsel, and the oral arguments presented to this court, this court finds the following facts:

1. Westek Associates is a partnership duly organized and existing under the laws of the State of California, and has a place of business in San Diego, California.

2. Tri–Lite Electronics, Inc. and Bright Image, Inc. (collectively referred to hereafter as "Tri–Lite") are corporations organized and existing under the laws of the State of Illinois. They have their principal places of business in Illinois.

3. Both Westek and Tri–Lite manufacture and sell "touch-control" adapters for electric lamps. When inserted into the light bulb socket of a standard electrical lamp which has a metallic exterior, each company's adapter enables a person to operate the lamp merely by touching the metallic exterior, instead of using the lamp's switch. Westek claims that Tri–Lite sells a touch-control adapter which infringes on one of Westek's patents. Tri–Lite asserts that this patent is neither valid nor enforceable, and that in any case its device does not infringe on Westek's patents.

4. The United States Patent and Trademark Office ("PTO") granted U.S. Patent No. 4,211,959 (hereafter referred to as the "959 Patent") entitled "Touch–Control Adapter for Electric Lamps" on July 8, 1980. A drawing of the preferred embodiment of this patent appears in the Appen-

dix. The named inventors of the patent, Joe E. Deavenport and John W. Roorda, assigned their entire right, title and interest to their invention and patent to Westek Corporation of San Diego, California. Westek Corporation subsequently assigned the 959 Patent to Westek Associates on December 10, 1985. Deavenport is not a partner in Westek, nor is he an employee of the partnership.

5. Claim 1 of the 959 Patent reads:

A control module adapter, to be used with any standard electric lamp having a metallic exterior portion, for turning said lamp on or off in response to a mere touching of said portion and for controlling by touch the brightness of light emitted from said lamp when it is turned on, said module comprising:

a male electrical receptable means of the screw-in type for screwing said module into the light bulb socket on said lamp;

electronic mounting means fixedly connected to said male electrical receptacle means having an electronic circuit mounted thereon; said circuit including

a capacitive means;

coupling means for mechanically and electrically coupling said capacitive means to said metallic portion whenever said module is screwed into said light bulb socket;

means for charging said capacitive means at spaced apart intervals;

means for discharging said capacitive means at a first rate when no person is touching said metallic portion, and at a second rate when a person is touching said metal portion;

control means for detecting said first and second discharge rates and for generating logic control signals indicating said rates;

a female electrical receptacle means of the screw-in type for receiving a light bulb; and

means for switching predetermined portions of power received from said male electrical receptacle means to said female electrical means in response to said control signals.

6. Claim 2 of the 959 Patent reads:

A module according to claim 1 and further including automatic sensitivity control means for detecting discharge rates lying between said first and second rates over several consecutive ones of said spaced apart intervals, and wherein said means for charging is responsive thereto for increasing the spacing between said intervals.

7. Various ways of controlling the amount of light emitted from a conventional light bulb operating in an electric lamp predate the 959 Patent. The best known of these are the simple "on-off" or two-way mechanical switch, and switches used with special light bulbs that provide three levels of brightness as well as turn off the light (so-called "three-way" lights). Lesser-known inventions predating the 959 Patent and related to its subject matter include the following:

(a) A circuit known as the "Deavenport 1 Circuit," developed by the co-inventor of the 959 Patent, Joe Deavenport. Little is known about this circuit, as Deavenport discarded the documents for it shortly after inventing it in June 1976. It detected variations in capacitance as a result of touch, and switched a light bulb as a result of the variations.

(b) Touch-control lamps manufactured by Touch-Me, Inc. in the summer and fall of 1976. These lamps contained all of their necessary electronic components inside the lamp itself or in a factory-installed socket. One of these lamps is known as the "Touch–Me Plant Lamp," a lamp placed in a pot of soil containing a plant. These lamps contained two different, but essentially similar, circuits, both known as the "Ball Circuit." The developer of this circuit was Newton Ball, who may have relied on Deavenport's work. Like the Deavenport 1 Circuit, the Ball Circuit detected variations in capacitance as a result of human touch. It included a touch-sensitive portion having a capacitor which was charged at spaced-apart intervals by an oscillator. When touched, the oscillator produced linear signals. The circuit did not produce logic signals indicating both the

touch and non-touch states. Touch–Me produced nearly one thousand plant lamps before going out of business in late 1976. Joe Deavenport gave one of the lamps as a gift to the wife of an owner of Westek in 1976 or 1977.

(c) A circuit described in U.S. Patent No. 3,784,848, known as the "Hamilton Patent." This circuit contained an automatic sensitivity control based on "hum detection," a process involving the interaction of the human body and ordinary alternating current signals present in electrical wiring.

(d) A device described in U.S. Patent No. 4,101,805, known as the "Stone Patent." This device was a touch-sensitive lamp socket which one could employ as original equipment on a lamp.

(e) A touch-sensing circuit disclosed in J.A. Williams, Touch–Sensing Circuit, 17 IBM Technical Disclosure Bulletin 166 (June 1974) (hereafter "IBM Circuit"). This circuit included a touch plate and an oscillator. The oscillator rapidly charges a capacitor at spaced-apart intervals. A person touching the touch plate adds capacitance to the circuit, causing the capacitor to discharge at one rate when no one is touching the touch plate and a second rate when a person is touching the touch plate. The circuit employed a differential amplifier to compare the discharge characteristic of the human body to a fixed internal reference, thereby allowing the circuit to determine whether it had been touched.

(f) A touch switch disclosed in N. Sunderland, C.M.O.S. Touch Switch, Wireless World 69 (May 1978) (hereafter "Wireless World Switch"). The switch contained a touch-sensitive circuit which had a touch plate and an oscillator. The oscillator rapidly charges a capacitor at spaced-apart intervals. A person touching the touch plate adds capacitance to the circuit, causing the capacitor to discharge at one rate when no one is touching the device and another rate when a person is touching the device. The circuit could detect the absence or presence of touch, but did not generate logic signals indicating the different rates. It possessed a variable resistor which one could adjust to change the rate

at which current from the capacitor discharged, so that one could adapt the circuit for operation in environments of various ambient capacitances.

(g) A circuit described in British Patent No. 1,306,825 (hereafter "Jackson U.K. Patent"), which possesses a touch plate, a capacitor, and an oscillator for charging the capacitor at spaced-apart intervals. The capacitor discharges at different rates depending on whether the touch plate is touched. The circuit detects the difference in discharge rates to determine if the touch plate has been touched.

(h) A light dimmer socket adapter described in U.S. Patent No. 3,450,941 (hereafter "Butts Patent"), which includes male and female receptacles for placement between a lamp socket and a light bulb. The circuit allows a person to select the brightness of a lighted bulb.

(i) A variable power control adapter described in Canadian Patent No. 831,615 (hereafter "King Canadian Patent"), which possesses male and female receptacles similar to those in (h) above. This device too possessed circuitry allowing variation of the brightness of the bulb.

8. The prior art shared these characteristics with the 959 Patent:

(a) The Ball circuit had a touch-sensitive area which had a capacitor which an oscillator charged at spaced-apart intervals. It also employed a means of detecting the difference between the touch and no-touch states, and triggered the light's switch as a result of this difference.

(b) The Hamilton Patent had a detector circuit that incorporated automatic sensitivity control.

(c) The Stone Patent was a touch-sensitive switch which one could use in a lamp.

(d) The IBM Circuit included a touch plate and an oscillator. Touching the plate caused the capacitor to discharge at a rate different from when the plate was not touched. The circuit contained a means of detecting the difference between these rates.

(e) The Wireless World Switch employed features similar to those of the IBM Circuit. See Finding 8(d) above.

(f) The Jackson U.K. Patent employed features similar to those of the IBM Circuit. See Finding 8(d) above.

(g) The Butts Patent discloses an adapter that one can place between an electric lamp socket and a light bulb which allows a person to adjust the brightness of a lighted bulb.

(h) The King Canadian Patent shared the features of the Butts Patent. See Finding 8(g) above.

9. The prior art differed in these respects from the 959 Patent:

(a) The Ball Circuit did not teach that one could put touch control into an adapter that a consumer could screw into any standard metallic lamp. It did not suggest or teach a device that generated logic signals indicating the touch and no-touch states. It also did not employ automatic sensitivity control, so that one could use it in a variety of environments. The only means of adjusting the circuit's sensitivity was manual.

(b) The Hamilton Patent relied on hum detection, not capacitance detection.

(c) The Stone Patent did not teach that one could put touch control into an adapter that a consumer could screw into any standard metallic lamp.

(d) The IBM circuit did not teach or suggest a device which produced logic signals indicating the touch and no-touch states. It also did not employ automatic sensitivity control.

(e) The Wireless World Switch did not operate as a digital device, one generating logic signals indicating the touch and no-touch states. The switch also did not employ automatic sensitivity control. Rather, like that of the Ball circuit, the sensitivity of the Wireless World Switch was susceptible only to manual adjustment.

(f) The Jackson U.K. Patent did not employ automatic sensitivity control.

(g) The Butts Patent required manual adjustment of the brightness of the lamp, and was not sensitive to the simple human touch of a metal portion of the lamp.

(h) The King Canadian Patent shared the same difference as the Butts Patent. See Finding 9(g) above.

10. None of the prior art teaches or suggests the subject matter of the 959 Patent as a whole. The prior art did not suggest or teach that touch-sensitive circuits could be placed within an adapter that could fit within the space available within the "harp" of a lamp, that portion of the lamp projecting from the lamp and surrounding its light bulb which supports the lamp's shade. The prior art also did not suggest or teach that one could connect the touch control socket electrically and mechanically to the metallic portion of the lamp by means of a depending electrical element which would overlay the metallic protion of the lamp whenever one screwed the adapter into the lamp. Lastly, the prior art did not suggest or teach that one could build a socket-adapter having all of these characteristics that would withstand the lamp's heat.

11. Joe Deavenport had a bachelor's degree in electrical enginnering, had some graduate education, and had worked as an electrical engineer and designer for close to twenty years at the time he invented the 959 Patent. Roorda had a bachelor's degree in mechanical engineering, also had done graduate work, and had several years' experience in laying out electrical components and designing their mechanical packages. Active workers in Deavenport and Roorda's field shared their educational level. The problems encountered in this field involve the design of analog and digital circuits, as well as the laying out and packaging of electrical and electromechanical components.

12. Several patents introduced at trial relating to touch control of lamps dated back to the 1960s, including one patent, U.S. Patent No. 2,810,066, which was filed in 1954.

13. Westek did not successfully sell its first or its redesigned adapters, even when it sold them at a loss. Because of this

failure, Westek stopped selling adapters for several years.

14. Deavenport knew of the Deavenport 1 and Ball Circuits at the time he and Roorda applied for the 959 Patent in September 1978. Deavenport and Roorda did not disclose these circuits in their application. The only prior art which they disclosed to the PTO were the Hamilton and Stone Patents.

15. Deavenport believed that the circuit which he designed for the 959 Patent was a substantial improvement over the Deavenport 1 and Ball Circuits developed two years earlier. Deavenport discarded some of his drawings and notes relating to development of the 959 circuit; the rest he produced for a deposition in Westek litigation with Southwest Laboratories, Inc. Deavenport cannot recall whether he gave these materials to Westek's attorneys or Southwest's, but Westek's attorneys aver that they do not have them. Deavenport produced his diaries from 1976–78 and other materials for this case.

16. The Deavenport 1 and Ball Circuits taught or suggested these features described in Claim 1 of the 959 Patent: a capacitive means; a means for charging this capacitive means at spaced-apart intervals; a means for discharging capacitive means at a first rate when no person is touching the touch-sensitive portion of the circuit, and at a second rate when a person is touching that portion; a control means for detecting the former and latter discharge rates; and a means for switching predetermined portions of power received from a male electrical receptacle to a female electrical receptacle in response to a variance in the discharge rates. A Touch-Me Plant Lamp which was introduced into evidence produced analog signals, but not digital logic signals.

17. Some of the features contained in the Deavenport 1 and Ball circuits were in prior patents within the field of search of the examiner for the PTO who worked on the application for the 959 Patent. For example, several patented circuits developed by Carl E. Atkins (U.S. Patent Nos. 3,593,073; 3,569,728; 3,275,897; 3,200,306;

3,171,066; 3,025,434) were sensitive to human capacitance and reacted to changes in capacitance. Another patented circuit, developed by John Szabo (U.S. Patent No. 3,715,623), varied current sent to a three-way light bulb.

18. The specification of the 959 Patent notes that one reason for the shape and design of the preferred embodiment of the 959 Patent is to allow it to fit into a standard lamp. Air holes provided in the preferred embodiment, according to the specification, allow the device's electronics to cool. Such cooling was particularly important in the 959 device, as one could count on the light bulb to generate great heat while lit. Such heat could damage electronic parts such as those in the 959 device.

19. The Tri–Lite adapter is used with standard electric lamps that have a metallic exterior which is in contact with the lamp's socket. The adapter controls the brightness of light emitted from the lamp in response to a touch to the exterior of the lamp. The adapter turns the lamp off and on, and while the lamp is on, the adapter can "ramp" the lamp through three intensities of brightness.

20. Tri–Lite sold 1.6 million adapters from the time Westek commenced this lawsuit until December 31, 1987. One reason for Tri–Lite's success was its ability to produce its adapter at a substantially lower cost than Westek did during the period discussed in Finding 13 above.

21. The Tri–Lite adapter couples to the metallic exterior of a lamp by means of a downward-extending leg, one that is radially spaced from the lamp's light bulb socket. A consumer can couple the leg to the lamp's exterior by twisting a set screw that extends from the distal end of the leg until it meets the socket. The adapter does not include inwardly biased spring fingers depending from its base which make immediate electrical and mechanical contact with the lamp's light bulb socket as the adapter is screwed into the socket, unlike the preferred embodiment of the 959 Patent.

22. The Tri–Lite adapter contains a circuit which includes an oscillator that charges a capacitor at spaced-apart inter-

vals. The frequency of the oscillator is constant, even when the ambient capacitance changes.

23. Those portions of the Tri–Lite adapter's circuit represented in elements 198, 202, 204, and 206 of the schematic diagram of the circuit introduced at trial detect the circuit's several cycles of charging and discharging. This is substantially the same as the function of "detecting discharge rates lying between said first and second rates over several consecutive ones of said spaced apart intervals" recounted in Claim 2 of the 959 patent.

24. Elements 204 and 206 of the Tri–Lite adapter's circuit perform a process of "averaging" over the several cycles of charging and discharging of the circuit. This is substantially the same process to which Claim 2 of the 959 Patent refers when it requires a means for detecting discharge rates "over several consecutive ones of said spaced apart intervals...."

25. Elements 198, 202, 204, 206, 208, and 210 of the Tri–Lite adapter's circuit allow the circuit to process information about discharge rates and in turn control the charging and discharging of the circuit's capacitor. When capacitance is added to the circuit, the circuit steps up the rate of discharge of its capacitive means, in order to maintain a constant trigger margin. These elements are functionally equivalent to those reflected in that part of Claim 2 of the 959 Patent which states "wherein said means for charging is responsive thereto for increasing the spacing between said intervals."

## CONCLUSIONS OF LAW

This suit arises under the United States Patent Code, 35 U.S.C. §§ 1 et seq. (1982). Jurisdiction and venue are based on 28 U.S.C. §§ 1338(a) and 1400(b) (1982). Jurisdiction and venue are proper in this court.

This case involves two major issues: (1) Is the 959 Patent valid? (2) Does the Tri–Lite adapter infringe on the 959 Patent? Each party has a different burden of proof with respect to each issue. According to 35 U.S.C. § 282, "A patent shall be presumed valid.... The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity"—in this case, Tri–Lite. Proof of invalidity must be by clear and convincing evidence. See *Atlas Powder Co. v. E.I. duPont de Nemours*, 750 F.2d 1569, 1573 (Fed.Cir.1984). By contrast, the burden of proving infringement rests on Westek. Proof of infringement requires only a preponderance of the evidence. See *Lemelson v. United States*, 752 F.2d 1538, 1547 (Fed.Cir.1985).

Tri–Lite attacks the validity of the 959 Patent in three ways. Tri–Lite first contends that both claims of the 959 Patent were obvious. Second, Tri–Lite suggests that Deavenport and Roorda acted inquitably in prosecuting the 959 Patent. Third, Tri–Lite submits that the 959 Patent insufficiently describes its device to enable a person of ordinary skill in the pertinent art to make and use the patented adapter without undo experimentation.

Under 35 U.S.C. § 103, a party may not obtain a patent "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." The Court in *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966), determined that § 103's condition of non-obviousness

lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.... Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter to be patented.

The prior art introduced at trial demonstrates that touch-responsive circuits were well known, but no one had developed a device which made it practical to bring

the benefits of touch control switching to existing lamps—especially without special tools. See Finding 7. The differences between the prior art and the 959 Patent are numerous and substantial. See Findings 9–10. The prior art did not disclose an adapter that incorporates a capacitive-sensitive circuit and automatic sensitivity control, which permits touch control of an ordinary lamp over a wide range of capacitative conditions. At the time of the invention of the 959 Patent, the art did not show or teach that one could provide consumers with the benefits of reliable touch control of existing lamps. The prior art also did not show or teach that (1) an adapter which one could screw into an existing socket was the way to deliver these benefits; (2) touch control could contain circuitry that would adapt the device automatically to different lamps and environments; (3) such a device could fit within the space available in most lamps; (4) one could make mechanical and electric connection to the exterior of an ordinary metal-encased lamp by means of a depending electrical element, one which would overlie the metallic portions of the lamp whenever one screwed the adapter into the lamp; (5) one could design an electrical circuit capable of providing touch-control and automatic sensitivity control within the space of an ordinary lamp, while withstanding the heat of the lamp.

Of course, what is inapparent to the average jurist may not be as mysterious to one skilled in the pertinent art. Determining the level of ordinary skill in the pertinent art requires consideration of six factors: (1) the education and experience of the inventor; (2) the types of problems encountered in the art; (3) the prior art solutions; (4) the rapidity of innovation in the art; (5) the sophistication of the technology in the art; and (6) the education and experience of active workers in the field. See *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve*, 796 F.2d 443, 449–50 (Fed.Cir.1986); *Jacobson Brothers, Inc. v. United States*, 206 Ct.Cl. 518, 512 F.2d 1065, 1070–71 (1975). Based on the facts reflected in Finding 11, the court concludes that persons with ordinary skill in the art

relevant to the subject matter of this case would have a bachelor's degree in electrical engineering, with several years' experience in the design of analog and digital circuits, or else a bachelor's degree in mechanical engineering, with several years' experience in laying out components and designing electromechanical packages.

When determining whether an invention would have been obvious in light of the prior art to a person with ordinary skill in that art, the court must decide the issue "entirely by reference to a *hypothetical* 'person having ordinary skill in the art.' The actual inventor's skill is irrelevant to this inquiry...." *Id.* at 448, quoting *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir.1985). Further, " 'it is impermissible ... to pick and choose from any one reference only so much of it as will support a given position to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one skilled in the art.' " *Bausch & Lomb*, 796 F.2d at 448, quoting *In re Wesslau*, 53 C.C.P.A. 746, 353 F.2d 238, 241 (1965). A court may not find that an invention was obvious by combining the teachings of prior art references to produce the claimed invention, absent some teaching or suggestion supporting the combination. The court may combine the teachings of different references to invalidate a patent *"only* if there is some suggestion or incentive to do so." See *ACS Hosp. Systems, Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1577 (Fed.Cir.1984) (emphasis in original; footnote omitted). The court also should not use the patent-in-suit "as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit." *Orthopedic Equipment Co., Inc. v. United States*, 702 F.2d 1005, 1012 (Fed.Cir.1983).

■ Tri–Lite builds its case for obviousness not on references which Deavenport and Roorda disclosed to the PTO, but on references which Deavenport and Roorda did not disclose: the IBM Circuit, the Wireless World Switch, and the Deavenport 1

and Ball Circuits. Tri–Lite has not proven by clear and convincing evidence that IBM Circuit, the Wireless World Switch, and the Ball Circuit were more relevant than those references in the field of search of the examiner. These devices go no further than the references available to the examiner in teaching or suggesting that one could design a touch-control adapter, with or without automatic sensitivity control. See Findings 7(b), (e), (f); 8(a), (d)-(e); 9(a), (d)-(e); 16. As for the Deavenport 1 Circuit, Tri–Lite has asked this court to draw certain negative inferences on account of Deavenport's failure to testify at trial and an assertion that Deavenport provided documents relating to the Deavenport 1 Circuit to Westek's counsel, documents which have disappeared. While this court is willing to draw some negative inferences from Deavenport's absence at trial, these inferences alone do not satisfy Tri–Lite's burden of proof of showing that the Deavenport 1 Circuit would have made the 959 Patent more obvious to a person skilled in the art than the cited references, or those within the field of search of the examiner.

The court thus holds that Tri–Lite has not proven by clear and convincing evidence that the invention contained in the 959 Patent was obvious to an ordinary person skilled in the pertinent art, in light of the art which existed prior to September 1978. If there were any doubt in this, secondary considerations would support the court's conclusion. See *In re Sernaker*, 702 F.2d 989, 996 (Fed.Cir.1983) (secondary considerations require a finding of non-obviousness "if the matter be otherwise doubtful"). Patents relating to touch control of lamps date back to the 1950s and 1960s. See Finding 12. The years of attention which inventors paid to the problem of touch control of lamps indicate a long-

felt need, one not satisfied until Deavenport and Roorda invented the 959 device. Tri–Lite's sales of 1.6 million adapters demonstrates that touch-control adapters with automatic sensitivity satisfied this need.*

█ The court thus turns to Tri–Lite's second attack on the 959 Patent: that Deavenport and Roorda acted inequitably in obtaining it by failing to disclose to the PTO the existence of the Deavenport 1 and Ball Circuits. "Inequitable conduct resides in failure to disclose material information ... with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence." *Kingsdown Medical Consultants v. Hollister Inc.*, 863 F.2d 867, 872 (Fed.Cir.1988). As noted in Finding 14, Deavenport knew of the Deavenport 1 Circuit at the time he and Roorda filed for the 959 Patent, and did not disclose these circuits to the PTO. The issues for this court are whether these circuits were material, and whether Deavenport and Roorda did not disclose them to the PTO with the intent to deceive the PTO.

The most encompassing test of materiality is contained in 37 C.F.R. § 1.56(a) (1988): whether "there is a substantial likelihood that a reasonable examiner would consider [the information] important in deciding whether to allow the application to issue as a patent." See *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1559–60 (Fed.Cir.1984) (relying on § 1.56(a) in determining whether conduct is inequitable). Tri–Lite's argument as to the materiality of the Deavenport 1 and Ball Circuits again rests on negative inferences as to what those circuits contained, and as noted earlier, the court will not draw these inferences. From all that appears, the Deavenport 1 and Ball Circuits would have been cumula-

---

* The court gives the commercial success of Tri–Lite some weight, but not overwhelming weight. Part of Tri–Lite's success stems from ideas embodied in the 959 Patent, but much of it comes from lower design and production costs. See Finding 20. While relying on Tri–Lite's success to support the court's conclusion of non-obviousness, the court does not find that success to be a substantial indicator of non-obviousness in this case. See *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1555 (Fed.Cir.1983) (court must consider commercial success in analyzing issue of obviousness, but should give more or less weight to evidence "depending on its nature and its relationship to the merits of the invention").

tive of references available to the examiner. Cumulative references are not material. See *id.*

Even if the Deavenport 1 and Ball Circuits were material, Tri–Lite still has not demonstrated inequitable conduct by clear and convincing evidence. This is because Tri–Lite has not proven that Deavenport or Roorda had the requisite intent. In deciding whether a party has acted with the intent to deceive, a finding that a party has acted negligently, or even grossly negligently, "does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown*, 863 F.2d at 876.

Based on the facts reflected in Findings 14–15, the court concludes that Deavenport and Roorda at worst acted grossly negligently in failing to disclose the Deavenport 1 and Ball Circuits. Tri–Lite's argument rests on Deavenport's failure to testify here—something which Deavenport was not obliged to do—and his lacking documents relating to these circuits. Many of these documents did not disappear, however, until after Deavenport's deposition in the Southwest litigation—several years after the prosecution of the 959 Patent. Moreover, Tri–Lite has not submitted any evidence that Deavenport or Roorda were responsible for the loss of documents produced to others. Deavenport did deliver documents for other litigation—evidence of his good faith in the matter—and from all accounts someone else lost them. Tri–Lite's evidence again does not prove an important issue or fact—here, intent to deceive—by clear and convincing evidence.

■ The court thus turns to Tri–Lite's last attack on the 959 Patent: the patent's failure to make an enabling disclosure. Section 112 of the Patent Code states in part:

The specification [of the patent] shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most clearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

Tri–Lite suggests that the 959 Patent is deficient because it does not describe how one should construct the adapter so that it and its electronic components can withstand the heat generated by a three-way light bulb. Tri–Lite's argument has some force. While the specification of the 959 Patent suggests that the adapter will be close to the light bulb, and that the adapter must have air holes to cool the electronics, see Finding 18, it does not expressly alert the reader to the problem of the lamp's heat. Tri–Lite did not demonstrate by clear and convincing evidence, however, that one with ordinary skill in the pertinent art would not be able to make and use a 959 adapter that could withstand the light bulb's heat. Accordingly, the court holds that Tri–Lite has not overcome the presumption that the 959 Patent meets the standard of enablement set forth in 35 U.S.C. § 112.

Tri–Lite thus has not overcome the statutory presumption that the 959 Patent is valid. The court now turns to the issue of whether the Tri–Lite adapter infringes on the 959 Patent. The first step in approaching this issue is to construe the claims of the patent. The court then must compare the claims to the alleged infringing device. See *Moeller v. Ionetics, Inc.*, 794 F.2d 653, 656 (Fed.Cir.1986). This process ensures that the court determines infringement on the basis of the claims, and not on the basis of the patent holder's commercial embodiment of the claimed invention. See *SRI Intern. v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1121 (Fed.Cir. 1985).

■ Westek has proven (and Tri–Lite admits) that the Tri–Lite adapter contains all

of the features of Claim 1 of the 959 Patent save one: a "coupling means for mechanically and electrically coupling said capacitive means to said metallic portion whenever said module is screwed into said light bulb socket." Tri–Lite concedes that its adapter has a coupling means for mechanically and electrically coupling its capacitive means to the metallic portion of a lamp, but disputes that this coupling occurs "whenever said module is screwed" into the light bulb socket of a lamp. Tri–Lite suggests that its adapter couples only once the consumer screws the thumbscrew into the lamp's light bulb socket. Westek argues that this quality makes no difference under Claim 1.

To resolve this question, the court must interpret the word "whenever" as used in Claim 1. When doing so, the court must ascribe to the word its " 'ordinary and accustomed meaning' " unless it appears that the inventor used it differently. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed.Cir.1984), quoting *Universal Oil Products Co. v. Globe Oil & Refining Co.*, 137 F.2d 3, 6 (7th Cir.1943). Tri–Lite suggests that "whenever" means "automatically when." Webster's Third New International Dictionary (1967) provides some support for this definition. "Whenever" has two common meanings: "at any or all times that: in any or every instance in which;" and "at whatever time: no matter when." These definitions suggest that the coupling described in Claim 1 should occur as one places the adapter into the socket. The definitions do not resolve the question, however, of whether this coupling should occur through the natural functioning of the device or with the assistance of the consumer.

When the court cannot determine the meaning of a term from its plain language, the court must look to other aids: the language of other claims, the prior art, the prosecution history, and the specification as a whole. See *SRI Intern.*, 775 F.2d at 1118. The language of Claim 2 indicates that when Deavenport and Roorda wished to employ the term "automatic," they knew how to do so. Claim 2 describes an *"automatic* sensitivity control means," not merely a sensitivity control means, or a means for controlling sensitivity "whenever" one uses the adapter. Similarly, the specification of the 959 Patent states that the electrical contacts indicated at 17 (see Appendix) are "for touching a metallic exterior portion of the lamp." "In the illustrated embodiment of Fig. 1 [see Appendix], contacts 17 touch the outside of socket 13." Nothing in the specification states that these contacts must or should touch automatically as one inserts the adapter into the light bulb socket.

The court thus rejects Tri–Lite's interpretation of the term "whenever" as it appears in Claim 1. The term does not limit the means for mechanically and electrically coupling the 959 Patent's adapter to the metallic surface of the lamp to those means which couple automatically. Instead, "whenever" means "at any time," and includes those times when the coupling means does not automatically touch the metallic surface when one screws the adapter into the socket.

So construed, the clause in Claim 1 describing the means of coupling the patented device electrically and mechanically to the metallic portion of the lamp reads on the Tri–Lite adapter, as described in Finding 21. The Tri–Lite adapter thus infringes upon Claim 1 of the 959 Patent.

■ The court now turns to Claim 2 of the 959 Patent. Westek concedes that Tri–Lite's device does not infringe literally on Claim 2, as the Tri–Lite device does not alter the spacing between intervals of charges to compensate for changes in ambient capacitance. See Finding 22. Westek argues, however, that the Tri–Lite adapter infringes on Claim 2 by virtue of the doctrine of equivalents. " 'To temper unsparing logic and prevent an infringer from stealing the benefit of an invention' a patentee may invoke this doctrine to proceed against the producer of a device 'if it performs substantially the same function in

substantially the same way to obtain the same result.' " *Graver Mfg. Co. v. Linde Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) (footnote omitted), quoting *Royal Typewriter Co. v. Remington Rand, Inc.*, 168 F.2d 691, 692 (2d Cir.1948) (Hand) and *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929).

In order to decide whether an accused device is equivalent to the patented device, the court must look at the patented device as a whole. Each of the patented device's limitations "must be viewed in the context of the entire claim." *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532–22 (Fed.Cir.1987). Further,

> "[i]t is ... well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." To be a "substantial equivalent," the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed.

*Id.* (footnotes omitted), quoting *Lemelson*, 752 F.2d at 1551.

Westek has proven (and Tri–Lite again concedes) that the portion of the Tri–Lite device's circuit which provides automatic sensitivity control performs substantially a similar function to achieve substantially the same result as the circuit described in Claim 2. The parties dispute whether the Tri–Lite device performs this function and achieves this result in substantially the same manner as in Claim 2. Based on the expert testimony delivered at trial, this court concludes that it does. See Findings 23–25.

Accordingly, the court concludes that Tri–Lite is liable to Westek for infringing Claims 1 and 2 of U.S. Patent No. 4,211,-959. The clerk will set this matter for trial on the issue of Westek's damages.

APPENDIX